## DU PONT v. DU PONT et al.

### (District Court, D. Delaware. April 12, 1917.)

#### No. 340.

1. CORPORATIONS &#8658;317(5)—OFFICERS—BREACH OF DUTY.

　　The president and largest stockholder of a large and prosperous powder manufacturing company on leaving for an extended absence on account of ill health left with the vice president, who then became acting president, a proposal to sell to the company a large block of his stock with a view to its resale at the same price to important employés. The vice president submitted the proposal to the finance committee, consisting then of himself and two others: but the others objected to the price and suggested a lower one, as the committee did also in its report to the directors, which was approved, requesting the vice president to take the matter

up further with the president. This he did by correspondence, but did not advise the president of the grounds of objection to his offer nor of the counter proposal, and after several letters had passed the president directed that his offer be withdrawn. The vice president did not show the correspondence to the other members of the committee, nor to the directors, even when requested to do so, nor did he inform them of the claim made by the president in his letters that because of large war orders for munitions already secured and to be secured, of which he was in position to know, the stock was worth considerably more than the price asked, which he made only because of his belief that at that time it was good policy to have the employés financially interested in the company, and that within a few months the value of the stock would still further increase, which proved to be the case. On being asked the progress of the negotiations, the vice president claimed that the offer had been unconditionally rejected by the company and had therefore been withdrawn. Shortly afterward the vice president and associates, through a corporation organized by them, and without the knowledge of the officers or stockholders of the company, other than those interested with them, bought all the stock of the president, who was still absent, paying for the common stock $40 a share above the price at which it was offered to the company. In order to finance the purchase, they borrowed several million dollars from banks in New York which were depositories of the company, and the deposits of such banks were on the next day largely increased from payments received on munitions contracts. *Held*, in a suit by stockholders against such purchasers, that the evidence sustained the allegations of complainants that the vice president while acting as representative of the company purposely withheld from it and from the president important information which it was his duty to disclose; that he and his associates also used the credit and funds of the company as an aid in financing their purchase; and that the company had the right at its election to take over the stock purchased, at the price paid, and to require an accounting for all dividends received thereon.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1408.]

2. CORPORATIONS ⬤426(12) — FRAUDULENT ACTS OF OFFICERS — RATIFICATION.

Strong objection having been made by other stockholders after the purchase became known, the vice president and his associates, after having at first refused to sell the stock, stated that they would consider an offer to purchase by the company subject to certain specified conditions and a resolution that such an offer be made was referred by the directors to the finance committee for recommendation. A motion in the committee to recommend the passage of the resolution failed to carry, and it was reported back without recommendation, and on a vote of the directors was defeated. Two of the four members of the committee, however, and nine of the nineteen directors voting on the resolution, were members of the syndicate or otherwise interested in the purchase, and the others were still ignorant of the circumstances which preceded it. *Held*, that such action was not binding upon the corporation as a ratification.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1702, 1716.]

3. CORPORATIONS ⬤426(1)—FRAUDULENT ACTS OF OFFICERS—RATIFICATION.

No action taken by the stockholders of a corporation can operate as a ratification of prior disloyal acts of its officers or individual stockholders, where such action is brought about by their own votes, or where information as to the acts for which ratification is claimed has been withheld from other stockholders.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1596, 1702.]

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. CORPORATIONS ⊚⟹376—POWERS—PURCHASING CORPORATION'S OWN STOCK.
The directors of a New Jersey corporation *held* to have power under its charter and the laws of the state, to purchase outstanding shares of its own stock, where it had at the time current quick assets more than sufficient, after making such purchase, to pay all of its indebtedness, including its funded debt, without impairing its capital paid in.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1530.]

5. CORPORATIONS ⊚⟹313—DIRECTORS—FIDUCIARY RELATION TO CORPORATION.
A director of a corporation stands in a fiduciary relation which requires him to exercise the utmost good faith in managing the business affairs of the company with a view to promote, not his own interests, but the common interest, and he cannot directly or indirectly derive any personal benefit or advantage by reason of his position distinct from his coshareholders. If he acts for himself in matters where his interest conflicts with his duty, the law holds the transaction constructively fraudulent and voidable at the election of the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1387.]

In Equity. Suit by Philip F. du Pont, wherein Eleanor du Pont Perot and others intervened, as plaintiffs, against Pierre S. du Pont, Irenee du Pont, Lammot du Pont, Alexis Felix du Pont, John J. Raskob, Robert Rulith Morgan Carpenter, Henry F. du Pont, Eugene E. du Pont, William Coyne, Harry G. Haskell, Harry F. Brown, John P. Laffey, E. I. du Pont de Nemours & Co., du Pont Securities Company, and E. I. du Pont de Nemours Powder Company. Decree for complainant, and intervening complainants.

See, also, 234 Fed. 459.

John G. Johnson, William A. Glasgow, Jr., and Henry P. Brown, all of Philadelphia, Pa., and Robert Penington, of Wilmington, Del., for plaintiffs.

William S. Hilles, of Wilmington, Del., George S. Graham, of Philadelphia, Pa., William H. Button, of New York City, and John P. Laffey, of Wilmington, Del., for defendants.

THOMPSON, District Judge. Philip F. du Pont, the original plaintiff, and Eleanor du Pont Perot, Eleuthere Paul du Pont, Archibald M. L. du Pont, Ernest du Pont, Alfred I. du Pont, Francis I. du Pont, Louis Albert de Cazanove, Jr., Henry S. Morris and Charles Ellis Gooden, intervening plaintiffs, are stockholders of the E. I. du Pont de Nemours Powder Company and E. I. du Pont de Nemours & Co., defendants.

The individual defendants are stockholders of the E. I. du Pont de Nemours Powder Company and the E. I. du Pont de Nemours & Co. and the du Pont Securities Company, defendant corporations.

The E. I. du Pont de Nemours Powder Company, hereinafter referred to as the "Powder Company," was organized in 1903, under the laws of the state of New Jersey. From December, 1914, to the beginning of this suit, its authorized capital stock was $60,000,000, of a par value of $100 per share, divided into 250,000 shares of preferred and 350,000 shares of common. There were outstanding 160,688 shares of preferred and 294,272 shares of common stock.

The E. I. du Pont de Nemours & Co. is a corporation organized un-

⊚⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

der the laws of the state of Delaware, incorporated September 4, 1915, and, prior to the filing of the bill, had purchased all the assets and assumed all the liabilities of the Powder Company, paying the Powder Company in cash $1,484,100, $59,661,700 par value in debenture stock, and $58,854,200 in common stock. All of the common stock, at the time of bringing suit, had been distributed two for one to the holders of the shares of common stock of the Powder Company. Since the incorporation of the E. I. du Pont de Nemours & Co., the board of directors and officers of the two companies have been the same, and the E. I. du Pont de Nemours & Co. has been the operating company.

The du Pont Securities Company is a corporation organized under the laws of Delaware, March, 1915, with a capital stock of $7,500,000.

The controversy is over the disposition of a large block of common and preferred stock of the Powder Company purchased by Pierre S. du Pont for himself and certain associates from T Coleman du Pont in February, 1915.

In December, 1914, T. Coleman du Pont was the largest individual stockholder of the Powder Company, owning 14,599 shares of its preferred and 63,314 shares of its common stock. He was a member of the board of directors, president of the company, and a member of its finance committee, and continued so to be up until March, 1915.

Pierre S. du Pont was a vice president of the Powder Company, a member of the board of directors, and chairman of its finance committee.

On December 14, 1914, Coleman du Pont went to Rochester, Minn., to undergo an operation, and remained there until after March 10, 1915. During Coleman's absence, Pierre was the acting president of the Powder Company and at the annual meeting held in March, 1915, he was elected its president.

For a number of years prior to December, 1914, and up until the beginning of this suit, Alfred I. du Pont was a vice president of the Powder Company, a member of its board of directors and of its finance committee, and was the next largest individual stockholder of the Powder Company owning 37,767 shares of its common stock.

William du Pont was, during the same period, a vice president, a member of the board of directors, and of the finance committee.

The finance committee consisted of four members, namely, Coleman, Alfred I., Pierre, and William. These four were the largest stockholders of the company.

Prior to going to Rochester in December, 1914, T. Coleman du Pont made an offer to sell to the company 20,700 shares of its common stock at $160 a share for the purpose of distributing the same among its more important employés at the price paid by the company. This offer was presented to the finance committee and considered by it at a meeting on December 23, 1914; Pierre, Alfred I., and William being present.

On February 28, 1915, Pierre purchased for himself and his associates, John J. Raskob, treasurer, Irenee du Pont, Lammot du Pont and R. R. M. Carpenter, all of them directors and some of them vice presidents of the Powder Company, and A. Felix du Pont, all of the

holdings of Coleman, namely, 63,314 shares of common stock at $200 per share and 14,599 shares of preferred stock at $85 a share.

Briefly stated, the plaintiffs charge in their bill: That at the meeting of the finance committee on December 23, 1914, the entire committee was in favor of the purchase of the stock, but Alfred and William considered $160 per share too high a price to pay and considered that the company was not justified in paying more than $125 per share for the stock at that time. That a resolution was passed to that effect which Pierre was instructed to communicate to Coleman's agent, L. L. Dunham, and that the duty rested upon Pierre to continue negotiations with Coleman for the purchase. That, from that time until the purchase by Pierre and his associates, the stock was rapidly increasing in value owing to large contracts made with European nations at war for the supply of explosives, and the duty on the part of Pierre of continuing negotiations and of giving to the company the benefit of his negotiations for the purchase was still existing when he purchased all of Coleman's stock for himself and his associates on February 28, 1915. That Pierre concealed from the finance committee and the Powder Company information relative to the negotiations for the said stock and concealed from Coleman the true attitude of the finance committee, and thereby kept the other members of the finance committee, the board of directors of the company, and Coleman du Pont in ignorance of facts which were within his knowledge, and which it was his duty to disclose, and that he thereby was enabled to acquire the stock for himself and his associates, when the opportunity, at least, to purchase the stock should, in the performance of his duty, have been presented to the finance committee and the board of directors, with a full disclosure of all the information in his possession in relation to the negotiations with Coleman and in relation to the increase in the business of the company, which affected the value of the stock. That Pierre du Pont and his associates would not have been able to make the purchase involving nearly $14,000,000 without the aid of the credit of the company, and that he and his associates used their official position and facts within their knowledge relative to the financial business of the company in obtaining the credit necessary to consummate the transaction.

The defendants contend that the action of the finance committee on December 23, 1914, was a final rejection of Coleman's offer to sell 20,700 shares of common stock, and thereupon all negotiations with him were at an end, and that Pierre had no further duty of negotiating the purchase for the company and was at liberty to negotiate and purchase the stock for himself and his associates; that, in arranging for the purchase of the stock, Pierre and his associates were fully able, upon their own credit and by the use of the stock purchased from Coleman and certain of their own stock as collateral to finance the transaction, to purchase the stock and in fact did so without in any way using the credit of the company and their official positions with the company to obtain a loan of the necessary funds to carry through the purchase.

[1] A fundamental fact to be determined, therefore, is whether the effect of what was done at the meeting of the finance committee on

December 23, 1914, was a rejection of the offer of T. Coleman du Pont, or whether its effect was to instruct Pierre to make a counter offer to Coleman of $125 per share and to continue the negotiations.

The following resolution appears upon the minutes of the meeting of December 23d:

"Purchase of Common Stock Owned by Mr. T. C. du Pont.

*   *   *   *   *   *   *   *   *   *

"Mr. P. S du Pont presented a letter from Mr. T C. du Pont, offering to sell 20,700 shares of common stock of this company at $160 per share. After discussion, it was moved and carried (Mr. P. S. du Pont voting in the negative) that Mr. P. S. du Pont be instructed to advise Mr. L. L. Dunham, attorney for Mr. T. C. du Pont, that we do not feel justified in paying more than $125.00 per share for this stock."

Alfred du Pont testified that, when the resolution was offered and adopted, it contained the words "at this time," and William du Pont testified that it contained the word "now," or some equivalent expression, so that the latter part of the minute should have read that "we do not feel justified in paying more than $125, per share for this stock at this time (or now)."

It appears that the minutes of the finance committee were examined and signed by Pierre and Alfred, which seems to lend some weight to Pierre's denial that the words "now" or "at this time" were part of the resolution as presented, but William's recollection of the resolution as presented agrees with Alfred's.

There was a meeting of the board of directors of the Powder Company on December 30, 1914, at which a report of the finance committee, dated December 24, 1914, was presented, containing the following statement:

"Purchase of common stock. An offer was received from Mr. T. C. du Pont to sell 20,700 shares of the common stock of this company at $160 per share. The committee expressed the feeling that we are not justified in paying more than $125 per share for that stock and asked Mr. P. S. du Pont to take the matter up with Mr. T. C. du Pont further."

The report was "accepted and ordered filed" and "approved, ratified and confirmed" by the board of directors on December 30, 1914.

In connection with what occurred at the finance committee's meeting, the letters of Coleman du Pont and what occurred between Pierre and Alfred prior to the meeting throw some further light upon what was the real action of the committee.

On December 7, 1914, Coleman wrote to Pierre as follows:

"Mr. P. S. du Pont, Vice President—Dear Sir: As you know I have always felt those in responsible positions in our company should be encouraged to become importantly interested in the common stock, and I have, as you know, always thought well of the common stock and put a higher figure on it than you have. I think it well worth 185 today and think it will go to 190 to 200 before the year 1915 is many months old. This ownership of the common stock by the leading men is of so much importance to the company that as a member of the finance committee (the company having cash away beyond its requirements) I would recommend the funds needed to carry the stock for those men be advanced by the treasury.

"I am willing to sell for the purpose twenty thousand (20,000) shares at $160 per share ex dividend payable in say thirty or sixty days.

"To guide me I should like to have a suggestion from the finance committee, or a committee appointed by them, as to how it should be distributed.

"Inasmuch as important men associated with us have asked me to sell them some stock, I should like to have a prompt answer from the finance committee to enable me to reply."

(Then follows a similar offer to the president of the Hercules and Atlas Companies.)

This offer of Coleman was orally communicated by Pierre to Alfred, and he expressed himself to Pierre as entirely in favor of its acceptance. Pierre then gave to Coleman a memorandum of the employés of the company to whom he suggested that the company should resell without consultation with the other members of the finance committee. Coleman then sent to Pierre the following letter:

"December 14, 1914.

"Mr. P. S. du Pont, Building—Dear Sir: I have given a great deal of thought to my letter of December 7 as to redistribution of this stock, and my judgment is that each member of the executive committee be allowed 1,500 shares. That the men whose salary is $500 a month and over will be allowed to subscribe for three times the amount of their salaries. This makes a total according to the memorandum you left with me of 20,700 shares. I am willing to furnish the other 700 shares, or the company can do this, as in your judgment seems advisable.

"I suggest you make this announcement some time prior to the 23d of this month as I think it has some advantage.

"As I am going away to-day and do not know how long I will be gone, I have left the matter in Mr. L. L. Dunham's hands. He can come to Wilmington and see you upon receipt of telegram from you.

"Yours very truly,                                   T. C. du Pont."

On December 14, 1914, Alfred wrote to Pierre as follows:

"E. I. du Pont de Nemours Powder Company.

"December 14, 1914.

"Mr. P. S. du Pont, V. P., Building—Dear Sir: After giving the question of purchasing a certain large block of du Pont common further consideration, I believe that 160, the price you talked of, is too high. 150 would be purchasing it on a 6 per cent. basis and 160 a 5 per cent. This is too low a rate for the company to invest its spare funds, and furthermore if it were offered to any of our employés it would not be sufficiently attractive at that price. I see no objection to the company purchasing this stock, but the question of price is one of great importance owing to the large investment. I would suggest that no decision as to the actual price be given the present owner until the finance committee has had ample time to think the matter over and discuss it together.

"Yours truly,                    Alfred I. du Pont, Vice President."

On December 21, 1914, Alfred wrote Pierre the following letter:

"E. I. du Pont de Nemours Powder Company.

"December 21, 1914.

"Mr. P. S. du Pont, V. P., Building—Dear Sir: I find that I made an error in writing to you under date of December 14 regarding the purchase of a certain large block of du Pont common stock in stating that 150 would be purchasing it on a 6 per cent. basis. I presume the discrepancy was noted by you as it should have been 133 and not 150.

"I doubt whether the investment of the company's surplus earnings by the finance committee on a basis even as high as 6 per cent. could be justified. In other words, if the company is unable to invest its surplus earnings at a rate better than the stockholders might themselves, they might contend that these earnings should be distributed in the form of a dividend. I presume that this matter will be discussed at our next finance meeting, on December 30.

"Yours truly,                    Alfred I. du Pont, Vice President."

From the testimony it appears that, during the discussion in the meeting, Pierre was in favor of purchasing the stock for $160 a share. Alfred was also in favor of the purchase, but took the position that that price was too high for the company to pay in view of the dividend of 8 per cent. then being paid and suggested $125 per share as being the limit in price which the company ought to pay. William was in favor of the purchase, but agreed with Alfred's idea that the investment could not be defended on a return of less than approximately 6½ per cent. and that $125 per share was all that should be paid for the stock. The letters from Coleman to Pierre of December 7th and 14th were not shown to Alfred or William. All three of the members of the finance committee, therefore, were in favor of the purchase of the stock at the time of the meeting and during the discussion. Neither Alfred nor William knew of what was stated in Coleman's letters to Pierre, except the bare fact that an offer had been made of 20,700 shares for distribution among the more important employés at $160 a share, and both Alfred and William were willing to pay $125 a share for the stock.

Alfred testifies:

"I suggested, after the resolution had been passed, that in conveying this information to Mr. Dunham that he tell Mr. Dunham to suggest to Mr. T. C. du Pont that if he could keep the offer open a month or two longer we might be able to increase the price offered for the stock."

Pierre du Pont testifies that he has no recollection of Alfred saying anything of that kind and "is sure he had no such instructions." Alfred's testimony is clear and positive. The latter part of Pierre's statement is evasive. In the absence of any explicit and unevasive denial by Pierre, I find as a fact that Alfred made the suggestion to which he testified.

As the resolution stands, it is not on its face either an acceptance or rejection of Coleman's offer, but contains an expression of opinion of which Coleman was to be informed by Pierre, through Dunham, that the committee did not feel justified in paying more than $125 per share for the stock. The report to the board of directors on December 30th justifies the conclusion that the committee did not refuse to accept Coleman's offer. It is there stated:

"The committee expressed the feeling that we are not justified in paying more than $125 per share for that stock and asked Mr. P. S. du Pont to take the matter up with Mr. T. C. du Pont further."

Pierre testified as follows as to what he reported to Dunham:

"XQ. Did you tell him then that the matter was finally ended? A. I reported what the committee had directed me to report.

"XQ. Did you tell him the matter was finally ended? A. I did not in those words. I told him the committee refused to accept the offer, which was exactly the same thing.

"XQ. And then and there, with the stating of that, he and you understood the thing was ended, did you? A. I understood that that was all there was to say. That was the last of my negotiation with L. L. Dunham on the subject."

If the intention of the finance committee was that Dunham was to be informed that the offer had been rejected and that was the end of the

matter, it is difficult to understand why they should report that Mr. P. S. du Pont had been asked "to take the matter up with Mr. T. C. du Pont further." It is clear that there was no intention on the part of the finance committee expressed in the minutes that the matter of the purchase of the stock should be ended by Pierre informing Dunham that the committee refused to accept the offer. According to Pierre's testimony, and he was the only one who could testify upon the subject except Dunham, who, for some unexplained reason, was not called as a witness, the price of $125 per share was not stated to Dunham, but he was informed that the offer had been rejected and nothing more. Pierre was not instructed to inform Dunham or Coleman that the offer of $160 per share had been rejected, but to inform him of the views of the finance committee upon the value of the stock and to take up further with Coleman, i. e., for further negotiation, the proposition pending before the committee whether or not it should purchase. To take a matter up further surely cannot mean to bring it to an end. The language implies a continuing commission to take up the matter in the future for further discussion or negotiation. It is not language that would be used in the ordinary course of business affairs to convey the meaning of bringing what had been pending to a finality by the rejection of an offer. Alfred and William are positive in their testimony that, when the resolution was offered in the finance committee, the words "at this time," or some equivalent expression, were added, and, in view of all the surrounding circumstances, it is found as a fact that language of that significance was contained in the resolution. The fact that the minutes were examined by Alfred and signed by him may well be explained by the absence of any cause at that time for him to suppose that the instructions to Pierre would be the subject of controversy. It was not the case of dealing with one at the time an adverse party, but of joint action of directors for the benefit of the company. In the light of the surrounding circumstances, however, and the language set out in the minutes in connection with the instructions to Pierre to take the matter up further, it makes little difference whether the resolution contained those words or not, for upon its face it is not a finality as a rejection of Coleman's offer. An expression of the value of property so fluctuating in price as stocks, and especially the stock of a company in the position in which the Powder Company was at that time, could not be regarded as applying to any time but the time at which the offer was considered; but such expression of opinion could not be construed as a direction to Pierre to inform Dunham that the offer was rejected. It was in effect a counter offer of $125 at that time with directions to Pierre to make that offer and report back to the committee. Was Pierre's conduct such as to relieve him of any further duty to the company so that he was free to act in the interests alone of himself and his associates?

Pierre, as we have seen, did not inform Dunham, nor in his subsequent correspondence with Coleman did he inform him, of the feeling of the majority of the finance committee as to the value of the stock, although he knew that the opinion of Alfred and William of the value of the stock was based upon the fact that the company was then paying a dividend of but 8 per cent., and that therefore the price of $160

a share would make it bring but a 5 per cent. return in dividends, and that the price of $125 a share was suggested upon an investment basis of 6½ per cent. And he did not, by showing Alfred or William Coleman's letter of December 7th, inform them of Coleman's opinion as stated in that letter:

"I think it well worth 185 to-day and think it will go to 190 to 200 before the year 1915 is many months old."

It surely would have been of advantage to the company to have the other members of the finance committee informed of the opinion of its president, who, with Pierre as acting president, was in the best position to know all about its business and its prospects, that its stock was worth at that time $25 a share more than the price at which he was offering it, and that during the following 12 months it would be worth $40 a share more; and it would have been to its advantage for Coleman to know that the price of $125 a share suggested by the finance committee was based upon the present dividend rate, and that Pierre had not placed before the committee Coleman's opinion of its present and prospective value. Alfred and William were not informed, when such information would have been of advantage to the company, of the contents of Coleman's letters of December 7th and 14th, except so much as was stated to them by Pierre at the meeting of December 23d, nor did they know of other correspondence concerning Coleman's offer which passed between Pierre and Coleman between the time of the meeting and the time of Pierre's purchase of the stock on February 28, 1915. And there is no evidence that Coleman ever knew of the feeling of the finance committee as to the value of the stock on December 23, 1914, until he received that information in a letter from Alfred dated February 16, 1915, written at a time when Pierre was negotiating for the purchase of the stock for himself and his associates at a price of $200 per share.

There is nothing in the evidence to show that Dunham reported to Coleman upon the subject of the stock, but it does appear that Pierre did "take the matter up further" with Coleman, without, however, informing him of the true position of the finance committee or the reasons for that position. On January 4, 1915, he wrote to Coleman:

"T. C. du Pont, President, Rochester, Minnesota—Dear Coleman: I have been intending to write you about the reception of your proposition by the finance committee. Unfortunately, Alfred, who had approved the plan before you went away, got somewhat crosswise in the meeting and I think it wise to let the matter rest for the moment; preferably until I can see you, before taking any other step. I am sorry and provoked that the proposition did not go through, for I feel that your offer was a generous one and should have had more considerate treatment; but, like many other things, the final result cannot be obtained quickly. * * *

"Your affectionate cousin, Pierre S. du Pont, Vice President."

This letter shows that Pierre understood that he was to take the matter up further, and the letter does not inform Coleman nor does it contain any intimation that the offer had been rejected, but it does not give Coleman the information which Pierre knew the committee intended him to have concerning their opinion of the price of the stock, nor does it inform him that the committee was not informed of his

views as to its value on December 23d or its prospective value during 1915. To this letter, Coleman replied as follows:

"St. Mary's Hospital, January 6, 1915.

"Dear Pierre: This is my first letter, a note yesterday to the kids was somewhat shaky as is this, but I hope you can read it.

"I am sorry that Alfred has taken the position you indicate and too, that it has passed the 1st of Jany. as to have made the announcement at Xmas seems to me would have been much more value to us from the human nature stand point.

"After talking to you I told some New York bankers that I would not need the money that I had arranged to get from them, as I had made a more permanent arrangement, but can I feel sure fix this when I get back. Perhaps it would be well for me to withdraw the proposition, if you think so do it, I of course know Alfred has some ulterior motive in mind, as he has tried to do what he could agin me at every opportunity, but this we both know, and I always take it into consideration. * * *

"I think Lew Dunham will be able to look after everything in the way of equitable finances, until I get back, even with the changed conditions; if not he will let me know and I will write you. * * *

"Your affec. cousin,                              Coleman."

This letter informed Pierre, if he had not been informed before, that Coleman was relying upon the sale for the purpose of obtaining money which he had formerly arranged to get from some New York bankers, and when Coleman authorizes him to withdraw the proposition, if it is well to do so, he is still allowed by Pierre, with the responsibility upon him of correctly informing Coleman as to the action of the committee, to continue in ignorance of the real situation and to base Alfred's attitude in getting "somewhat crosswise in the meeting" upon some ulterior motive upon his part. He writes to Coleman on January 9, 1915:

"Coleman du Pont, President, Rochester, Minnesota—My Dear Coleman: I was very happy to receive your letter of January 6th, particularly as it was in your own handwriting, indicating that you are feeling much better. * * *

"I feel you must be much disappointed in the question of the stock subscription. I used my best judgment in not trying to force the situation. Possibly I could have put it through by insisting, but at great risk of having the other side pitted against me; that might have complicated the whole plan for good and all. As it remains now, I feel that the proposition is open for reconsideration at your option, of course. Willie (meaning William du Pont) is away at present, but will be back in a couple of weeks; at which time I will take up the work again, unless I have word from you to the contrary. My judgment is that the deal will go through this time. * * *

"Your affectionate cousin,        Pierre S. du Pont, Vice President."

Coleman then wrote to Pierre as follows:

"Rochester, Minn., 1/11/15.

"Dear Pierre: * * * Your letter just received and I was very glad to get it. * * *

"As to stock subscription I believed it was a good thing for the Co., when I made the offer and made a price that I thought low, but I concede that I have always placed a higher value on the stock than others, I did it for the good of the new committee, but am not anxious from a selfish standpoint to carry it out, except for the good of the Co. and that is more important than personal reasons.

"If you feel it a good thing for the Co. talk to Willie and do it if not don't. It may make some diff in my equitable finances but I think not that is I

think can make some arrangement when I get back that I canceled before leaving so use your own judgment. * * *

"Your aff. cousin,                                                    Coleman."

On January 14, 1915, Pierre replied to this letter as follows:

"Mr. T. C. du Pont, Rochester, Minnesota—My Dear Coleman: * * * As to the stock offer: In Willie's absence I shall do nothing. He will be here in a week and I will try to get some action. If this is not possible it will mean that the question of value of the stock was not uppermost in their minds. If not finally accepted would you approve making an offer direct to the men? I should think that a financing suitable to you might be arranged. I am quite sure that they would like to take the stock, but do not feel in position to say anything while you are negotiating with the company. No one but the executive committee and directors know of the offer as far as I know. The board of course knew it through the minutes of the finance committee.

"Your affectionate cousin,                              Pierre S. du Pont."

This letter of Pierre's makes it clear that he knew that the offer for Coleman's stock had not been rejected, and that at the time the letter was written the negotiations between Coleman and the company were still pending.

When Pierre says: "In Willie's absence I shall do nothing. He will be here in a week and I will try to get some action. If this is not possible it will mean that the question of value of the stock was not uppermost in their minds"—he was evidently referring to what Coleman said in his letter of January 11th about price, but he still omitted telling Coleman that Alfred and William thought that the stock was worth but $125 on December 23d. If the facts stated to Coleman had been known to them and it had been made known to Coleman that the resolution offered in the committee did make it apparent that the price was what was uppermost in their minds, it surely would have been of advantage to the company in the negotiations that were pending, in view of the immense increase in the business of the company, which will appear later, and its influence upon the value of the stock. Meanwhile, Coleman, on January 15th, wrote as follows:

"Rochester, Minnesota, January 15, 1915.

"Dear Pierre: Thinking over the stock offer matter: I still think it an advantage to the company, but in view of Alfred's position I think it best to withdraw it if the finance committee has not accepted my proposition; when I get home we can talk it over and if best I can renew it, but it seems very unbusinesslike to leave it in its present condition.

"Of course if you have talked to Willie or are in any way committed that settles it, I will carry out any statement you have made on the other hand if you have not made any my judgment is to withdraw it, again if you have any good reason for not doing so let me know your position. * * *

"Your affectionate cousin,                              Coleman du Pont."

Coleman then sent to Pierre the following telegram:

"January 17, 1915.

"Rochester, Minnesota, P. S. du Pont, Wilmington.

"Letter of 14th received. If you are not committed withdraw my offer. Will write.                                    Coleman du Pont."

When Coleman wrote his letter of January 15th, in which he states he thinks it best to withdraw the offer "in view of Alfred's position," but leaves the matter to Pierre's judgment, he had not received Pierre's

letter of the 14th. Moreover, not having been informed by Pierre that the failure to accept his offer was based upon the value of the stock on December 23d, and neither of the other members of the finance committee having any knowledge of the negotiations or the withholding of information from him, Coleman now concludes to withdraw the offer if Pierre is not committed, but says:

"When I get home we can talk it over and if best I can renew it, but it seems very unbusinesslike to leave it in its present condition."

Upon having received Coleman's letter of the 15th and telegram of the 17th, Pierre wrote him as follows:

"January 18, 1915.

"Mr. T. C. du Pont, Kahler Hotel, Rochester, Minnesota—My Dear Coleman: Yours of the 15th has just come to hand. I have not talked with Willie alone, as he has been absent a couple of weeks and will not return for another week. However, as he supported Alfred in the stock proposal, I feel that I have obtained his opinion, but I had hoped that they would both swing around at our next meeting. There is, of course, no commitment; but I think there will be some disappointment, as I believe that the members of the executive committee were anxious to take the stock. Of course, no others than the executive committee and the board know of the offer, but I am sure that all the men would like to make the subscription, if the offer was made to them. I will of course do nothing further until I am authorized by you.

"Nothing new has turned up since the last writing. We have not yet heard from the large order for Russia; though to-morrow is the last day. I will write you later what we hear.

"Your affectionate cousin,          Pierre S. du Pont."

The correspondence between Coleman and Pierre up to this point shows that the offer of Coleman was not rejected and was not so considered by Pierre, and it shows that Pierre did not regard Coleman's telegram as a definite and final withdrawal of his offer, but construed it in the light of Coleman's statement, "When I get home we can talk it over and if best I can renew it." Pierre says, "I will, of course, do nothing further until I am authorized by you."

It is impossible to reconcile Pierre's insistence that the offer was finally rejected on December 23d, with his own declarations in his correspondence with Coleman, and it is significant of the fact that he did not even at this point intend to construe Coleman's letter and telegram of January 15th and 17th, respectively, as final instructions to withdraw the offer, that he did nothing about withdrawing the offer, and did not report the fact that the offer was withdrawn to the finance committee. The only construction which can be put upon his conduct up to that time, which harmonizes with the resolution of the committee, the report to the board of directors, his correspondence with Coleman, and his subsequent conduct, is that he had at that time the intention of concealing from the finance committee the fact that he was negotiating with Coleman and of taking the position with them that he understood that the offer had been rejected on December 23d; of keeping Coleman in ignorance of the attitude of the finance committee and at the same time keeping the negotiations open with Coleman and the matter in such position that, in case the opportunity arose, he might take advantage of the negotiations for his own benefit rather than that of the company. Coleman, in the meanwhile, replied on January 19th to

Pierre's letter to him of January 14th, in which Pierre had suggested that, "If this (some action upon William's return) is not possible it will mean that the question of value of the stock was not uppermost in their minds":

"Rochester, Minnesota, Jan. 19, 1915.

"Mr. P. S. du Pont, Wilmington, Del.—Dear Pierre: Upon receipt of your letter of the 14th, I telegraphed you, 'Letter fourteenth received. If you are not committed withdraw my offer. Will write,' which is now confirmed.

"Inasmuch as Christmas and January first are past I don't think two or three more months will make any difference, and in my mind it would be such a good thing for the young men to have a stock interest that I am sure we can arrange for them to take it without it being purchased by the company, through one of the New York banks, probably the Bankers' Trust Company, but I believe if this is left until I get home we can work it out better.

"I note by the Wilmington papers of a few days ago that common stock was selling at 155 to 160. With the outlook and the orders ahead I can't understand why the prediction in my letter to you that the stock would be 180 even 200 during the first few months of 1915, is not being fulfilled.

"I note that the total orders are something over $40,000,000 with $10,000,-000 more in prospect, not counting the two partially payable in bonds. These should certainly make the dividend 50 per cent. on 1915 and 1916 and 1917 which should make the stock easily worth 200. At any rate, I feel sure we can work out some plan that will be beneficial to the important men in the company and, therefore, beneficial to the company, just as soon as I get back home.

"Speaking from memory, you or some one told me that Alfred considered the common stock worth 300: therefore the price was not the reason for his changing his mind after I left Delaware.

"Your letters are all fully appreciated, but there is nothing going on at this end of the line give me the opportunity of writing much in reply.

"Your affectionate cousin,                         Coleman du Pont."

This letter and the telegram of the 17th should be considered in the light of Coleman's ignorance of the position of the finance committee and Pierre's concealment from Alfred and William of the correspondence between himself and Coleman and concealment from them of Coleman's ignorance of the position of the committee in relation to the price of the stock on December 23d.

In Pierre's letter of January 14th he puts to Coleman the suggestive question:

"If not finally accepted would you approve making an offer direct to the men? I should think that a financing suitable to you might be arranged."

Thus the first suggestion of not selling to the company came from Pierre at a time when it was his duty to keep the negotiations alive for the company. Coleman replies in the letter of January 19th:

"I am sure we can arrange for them to take it without it being purchased by the company, through one of the New York banks, probably the Bankers' Trust Company, but I believe if this is left until I get home we can work it out better."

Then on January 20, 1915, Coleman wrote to Pierre in answer to Pierre's letter of the 18th:

"Rochester, Minn., Jany. 20, 1915.

"Dear Pierre: Yours 18th received this a. m. and I am sure we can work out some plan on my return that will accomplish what we want. I can-

not understand why the other two should not have taken advantage of the offer and let the Co. help the men on whom the success must depend.  * *  *
    "Regards to all,
        "Your aff. cousin,                                    Coleman."

If Pierre had given Coleman the information which it was his duty to give him and had given Alfred and William the information contained in his correspondence with Coleman, Coleman would have understood their position and they would have understood that of Coleman. Coleman would not then have been under the impression that they did not want to take advantage of the offer and let the company help the men, and that in order for the sale to be beneficial to the company, it would be necessary to work out some plan upon his return by which the men could take the stock through some outside method of financing, as suggested to him by Pierre.

On January 25, 1915, Pierre wrote to Coleman:

"Mr. T. Coleman du Pont, Rochester, Minnesota—My Dear Coleman: On my return from New York, where I have been for a couple of days, I find your letter and am glad to hear from you again. I am sure that some plan of advantage can be worked out when we next meet. A couple of days ago Alfred suggested to me that the finance committee take up the question of selling treasury stock to our important men. What would you think of such a plan? I do not know what he has in mind, but suppose something similar to your offer, excepting at a lower price. I do not think it need interfere with your arrangement if you desire to put it through also."

(Then follows some information in relation to supplying powder for the British government through J. P. Morgan & Co., who had been appointed financial agents for the purchase of supplies. He then relates an interview with a Mr. Kraftmeier upon the subject of protecting the Allies from the possible danger of interests inimical to them getting control of the Powder Company through purchase of its stock. He then resumes:)

"Your predictions as to the common stock have been nearly realized. John Raskob tells me this morning that the price has reached $188/190.

"It is difficult to judge of the effect of earnings by the extraordinary business. In the neighborhood of 100 per cent. seems a fair guess. That amount reinvested, say, on a 10 per cent. basis would mean a permanent increase of 10 per cent. on the earnings. Eventually this can be accomplished, so I think it would be fairer to count on 5 or 6 per cent. for the first couple of years. My judgment is that we will be warranted in resuming a 12 per cent. dividend basis for this year. I have another reason for advocating this, that I am quite thoroughly persuaded it will be a mistake to publish our quarterly statement this year."

He then states at length his reasons for not publishing the statement, and adds:

"The following are the figures on total sales, to date:
                                                    Quantity, pounds
    Cannon ...............................................33,291,000
    Rifle ................................................ 7,952,200
    Guncotton ........................................... 8,772,000
    Triton .............................................. 5,984,375
                                                         ──────────
        Total ..........................................55,999,575
"In addition to the above we have offers for 14,027,500 lbs.
        "Your affectionate cousin,                 Pierre S. du Pont."

In this letter Coleman's proposal to sell his stock is still under consideration, and it appears that the stock on January 25th had risen

to the price of 188 or 190 on the market. It also shows what was Pierre's judgment of the dividend-earning value of the stock.

The conversation with Mr. Kraftmeier, referred to in the foregoing letter, was later the subject of discussion between Pierre and Alfred, and the suggestion was made that Pierre, Alfred, William, and Coleman deposit their stock for the purpose of preventing what seems to have been feared by Mr. Kraftmeier, and, in pursuance of that, Pierre wrote Coleman as follows:

"January 28, 1915.

"Mr. T. C. du Pont, Rochester, Minnesota—My Dear Coleman: In talking over the Kraftmeier rumor with the finance committee, it was suggested that we four large stockholders place our stock together for a period of time covering this extraordinary war condition with an agreement that the certificates would not be sold or used as collateral unless by common consent. I do not think it was intended to mean that any individual would be forbidden to use his certificates without consent of the others. In my opinion it would be better to agree that one could not use his certificates unless the others knew about it. Alfred proposed that any loans that might be now outstanding with du Pont stock as collateral could be taken up by the company and thus enable each individual to carry out the plan. The company could not suffer by this as they cannot put out within a reasonable time their large cash balance at more than ordinary interest. Surely with company stock as collateral would be more than safe. After suggesting this plan Alfred stated he had no loan on his stock, in a way that suggested a proposal for a show-down. Willie then stated that he had no loans. I said that I had none. As far as I know neither was acquainted with the other's position up to that moment. They then asked me to communicate with you to see if you would approve of the plan as outlined. Personally, I think it a good idea, as our ability to state positively that control of the stock was absolutely safe would put our foreign orders in much better position. Our business with the side of the Allies is so large now it may mean to them the turning point of the war. It is therefore, of the utmost importance that they know our situation. If you approve the plan and are in position to have Lou Dunham put it through, it would be a very good thing to tell Mr. Kraftmeier that we have determined to do this in order to assure our customers of the true position.

"Your affectionate cousin,          Pierre S. du Pont."

To this Coleman replied:

"Rochester, Minn., Jan. 31, 1915.

"Dear Pierre: I am in receipt of your letter of January 28th, in regard to depositing stock and am sending the answer through Lew in same mail, if it is not inconsistent with what he has done since I left and the statement I made from memory correspond with the record he will take or mail it to you. I have been out of touch with the details left in Lew's hands so long that this is only fair to him and me, neither do I care to give you ancient history.

"Your aff. cousin,          Coleman du Pont."

Pierre and Alfred had some discussion on January 23d, and Pierre testified that at that time he told Alfred that Coleman's offer had been "turned down" by William and Alfred on December 23d. Alfred denies that Pierre made this statement to him on January 23d, and states that he had no conversation with Pierre on the subject of Coleman's offer until February 10th, on which date there was a meeting of the finance committee at which Pierre, Alfred, and William were present. The evidence bears out Alfred's statement. Alfred testified as follows in relation to what occurred at that meeting:

"As I was about to leave the room, I remarked to Mr. P. S. du Pont, 'How are the negotiations for the Coleman du Pont stock progressing?' He re-

marked to me, 'Why, they are all off.' I said, 'Since when?' I had not been informed that they had been called off. He said, 'They were called off shortly after you and Mr. William du Pont turned down his offer in December.' I said, 'But the offer was not turned down.' I said, 'There was merely a difference of opinion as to price, and it was my understanding that you were to convey to T. C. du Pont through Mr. Dunham the information of the fact that we believe the price that he demanded for the stock, of $160 a share, to be excessive, and we suggested $125 a share as a proper price for the stock at that time.' Mr. P. S. du Pont, said: 'That was not my understanding. My understanding was that you turned down Mr. T. C. du Pont's offer definitely.' I appealed to Mr. William du Pont, who was seated across the table, within a few feet of me, and I asked him whether his understanding was consistent with my own. He said it was. I then said to Mr. P. S. du Pont, 'There seems to have been some misunderstanding as to the position taken by Mr. William du Pont and myself as to the meeting in December, and I desire to have this matter cleared up.' I said, 'You have unintentionally misinformed Mr. T. C. du Pont, and I suggest that Mr. William du Pont and I write to Mr. T. C. du Pont setting forth our views.' Mr. P. S. du Pont agreed that that would be an excellent course to pursue. Thereupon I asked Mr. P. S. du Pont if he would kindly send me such correspondence as had passed between himself and Mr. Dunham or Mr. T. C. du Pont in reference to the action of the finance committee on the date of December 23, 1914, so that I might be fully informed as to precisely what he said and before I, in turn, placed my view before Mr. T. C. du Pont. He kindly said that he would do so. I also asked him if he would please send copies to Mr. William du Pont, so that in the event of his desiring to write to Mr. T. C. du Pont, he would be fully informed and could do so. That was all that took place, as I remember, at that meeting."

Upon this matter, William du Pont's testimony is as follows:

"Q. After that meeting of the finance committee, when was the first time that you heard any discussion or talk about the proposition of Mr. T. Coleman du Pont? A. In February, the meeting held in February.

"Q. About what time in February can you tell us? A. I should think it was the second Wednesday in February.

"Q. That would be about the 10th? A. I suppose so. Meetings of the finance committee were held on the second Wednesday of each month.

"Q. Who were present at that meeting of the finance committee in February that you speak of? A. Mr. P. S. du Pont, Mr. Alfred I. du Pont, and myself.

"Q. What reference was made to the offer of Mr. T. Coleman du Pont at that time? A. Mr. Alfred I. du Pont asked how the negotiations were coming on.

"Q. Whom did he ask? A. Mr. Pierre S. du Pont.

"Q. What did he reply? A. As near as I can recall, he replied that they were off.

"Q. Did Mr. Alfred I. du Pont say anything to him about it further? A. He asked why they were off, and Mr. P. S. du Pont replied, I think, through the action of the finance committee. I am not quite clear about what the words used were.

"Q. Was that the substance of it? A. That, was the substance of it, yes.

"Q. Then what did Mr. Alfred du Pont say, if anything? A. He said that was not his recollection. He asked me if it was my recollection. I said, No, it was not supposed to have been final.

"Q. Did Mr. Alfred du Pont tell him what he thought the finance committee's action was? A. Yes.

"Q. What did he tell him, if you recall, either in substance or words? A. I could not recall the words. He told him that the offer made before had not been a declination in any sense, simply it had been a counteroffer.

"Q. Then did you hear Mr. Alfred du Pont ask him anything about any communication that he made to Mr. T. Coleman du Pont on the subject, ask him for any letters? A. He asked for some letters, I think.

"Q. Mr. Alfred du Pont did? A. Yes.

"Q. Did he make any suggestion at that meeting as to what he would do or what you should do with regard to it? A. He suggested he would write to Mr. T. C. du Pont.

"Q. Alfred did? A. Yes.

"Q. Did he make any suggestion as to what you should do? A. I think he did. I think he suggested I should write.

"Q. Did you after that write to Mr. Coleman du Pont? A. No, I did not.

"Q. Why not? (Objected to. Objection overruled. Exception noted for defendants.)

"Q. State why you did not write Mr. Coleman du Pont. A. I understood Mr. Coleman du Pont was a very ill man, and did not think he was in a physical condition to be bothered with the matter."

On February 11, 1915, Pierre wrote to Alfred and William as follows:

"P. S. du Pont, Wilmington, Del.

"February 11, 1915.

"Messrs. Alfred I. du Pont, William du Pont, Building—Gentlemen: I am inclosing herewith a copy of my letter addressed to Mr. T. C. du Pont and copy of his reply on the subject of depositing stock. In talking with you yesterday I had not in mind that the letter to me contained so little concerning his point of view. The letter to Dunham, which I read but of which I have no copy, gave me the impression he did not care to go into the matter, for I wrote him afterwards: 'In view of your letters, I propose stating to the finance committee that you are not in position to take advantage of offers to loan money and that you do not care to deposit stock at this time.'

"I think, however, this answers the question fully. If there is anything you wish to add to my letter, I shall be glad to have you send it direct or forward it to me.

"Very truly yours,                         P. S. du Pont."

The letters inclosed and sent to Alfred and William were the letters of January 28, 1915, from Pierre to Coleman and Coleman's reply of January 31, 1915, in relation to the Kraftmeier incident and the pooling of stock. It is apparent that they had nothing whatever to do with the offer for the sale of Coleman's stock. The question of Coleman's pooling his stock had been previously disposed of, so Pierre could not have supposed that what Alfred wanted was the correspondence between Pierre and Coleman in regard to that arrangement. Pierre admitted at the trial that he knew what letters Alfred wanted, but sent the others inadvertently or because he was not in the habit of sending Alfred his private correspondence. The reference in the letter of February 11th to the conversation "yesterday" shows that Alfred's testimony and William's as to the date when Pierre told them the offer of Coleman had been "turned down" was correct. The following day Alfred, finding the letters in relation to Coleman's stock offer were not sent him, wrote to Pierre as follows:

"February 12, 1915.

"Mr. P. S. du Pont, V. P., Building—Dear Sir: I have your letter of February 11th, addressed to Mr. William du Pont and myself, inclosing copy of letter written to Mr. T. C. du Pont, under date of January 28th, and his reply to you, under date of January 31st. These letters refer to my suggestion that the four largest stockholders deposit their stock under a common guardianship during the present emergency. The letter which I had particularly in mind was the one you wrote Mr. T. C. du Pont, regarding his stock offer. There seemed to be a misunderstanding as to the position which Mr. William du Pont and I took regarding this offer to Mr. T. C. du Pont. In

order that Mr. T. C. du Pont may have no misunderstanding as to our position in the matter, I should like a copy of this letter sent to Mr. William du Pont and myself, for our information.

"Very truly yours,          Alfred I. du Pont, Vice President."

To this letter Pierre did not reply. The evidence irresistibly forces the conclusion that there was a deliberate intention on Pierre's part to conceal from Alfred and William the correspondence which would have disclosed the true state of facts and disproved Pierre's statement that the offer had been "turned down" on December 23d.

Coleman, not having heard further from Pierre concerning the sale of the stock, wrote him the day after Alfred had asked for the correspondence in relation thereto, as follows:

"Rochester, Minn., Feb. 13, 1915.

"Mr. P. S. du Pont, Wilmington, Del.—Dear Pierre: I got a little too gay last week and have been on the 'blink' for five or six days, but am getting along all right now.

"The more I have thought of the stock question the more I believe with what little information I have that the common stock should reach 250 and may reach 300. If this is true, the men who are now at the helm and actually doing things should make the profit as between to-day's figure and that figure; it will be by far the best thing that can happen to the company. So clear I am that this is the right time to get them interested that I am willing, figuring as surely as I can that this stock will go much higher, to let go for the benefit of the men who are working, which, of course, means the benefit of the company, 20,000, 30,000 or even 40,000 shares at to-day's market, which I assume is about 200. As to the details of working this out I am entirely willing to leave this to you and Lew.

"If much time is desired the price should be higher. If the arrangement for cash payment is made through banks there should be no increased price. In order to get time when we purchased the company originally what we gave to be allowed time amounted to, I believe, over one hundred per cent. increased price, this because the element of chance must necessarily come in.

"Of course, I am only using my best judgment in this matter, but I am willing and strongly urge that the heads of departments and younger members of the family become most interested in the common stock. * * *

"Your aff. cousin,          Coleman du Pont."

It appears from Pierre's letter to Alfred and William of February 11th that Coleman was not in a position to take advantage of offers to loan money nor did he care to deposit the stock at that time. His offer to sell 20,000, 30,000 or even 40,000 shares at about 200 may be read in connection with what he had previously said in his letters about arranging means through the sale of his stock to raise money which otherwise he would be obliged to arrange with bankers in New York.

Coleman, being still without information as to the attitude of the finance committee concerning the sale of his stock, now comes forward with an offer to sell the major part of his holdings at $200 per share. Alfred and William were never informed by Pierre of the offer contained in Coleman's letter of February 13th nor knew of its existence until the letter was produced at the trial. Alfred being in ignorance of Coleman's opinion of the value of his stock and Coleman being in ignorance of Alfred's and William's attitude towards his offer in December, Alfred wrote to Coleman as follows:

"February 16, 1915.

"Mr. T. C. du Pont, Rochester, Minn.—Dear Sir: At a meeting of the finance committee, held some time in December, Mr. P. S. du Pont brought to the attention of the committee your wish to dispose of twenty thousand shares of common stock of the Powder Company at $160.00 per share with the suggestion that same be redistributed upon some liberal basis among the more important of the company's employés.

"The committee were in accord with your general idea; viz. the purchase from you of 20,000 shares of stock, and I believe were also a unit on the point of a redistribution of at least a portion of this stock to the company's employés, upon some plan to be subsequently defined.

"The one point, on which there seemed to be a difference of opinion, was the question of price. The position which I took on this point, and which I believe was similar to the one maintained by Mr. William du Pont, was that in purchasing this stock at the price suggested by you, which would involve the expenditure of $3,200,000 of the stockholders' funds, an investment of this size by the finance committee could not be defended on a return of less than approximately 6½ per cent. or at least better than 6 per cent., and for this reason, the price of $125.00 or an investment on a basis of, roughly, 6½ per cent. was suggested. It is my opinion that this principle should be the guiding one in any investment of the company's surplus funds, in lieu of a distribution of same.

"Again, in offering this stock for subscription to our employés, it should be made on an attractive basis, which, in my opinion, should not be less than 6½ per cent., and, as the company cannot afford to lose on a transaction of this kind, it was manifestly impossible for it to purchase stock at one figure and offer it to its employés at a lower one.

"I believe it an excellent time to make an offer of this character to the employés at as low a figure as is consistent with the company's interests, in order that the employés may benefit by any increment in value, which the present conditions would seem to indicate as quite probable, and I furthermore believe that if the company can purchase this stock from any outside source, it would be better to acquire it in this manner, rather than issue its treasury stock for the above-mentioned purpose.

"I am setting my position before you clearly, for the reason that I have lately ascertained from Mr. P. S. du Pont that he did not understand my position as I had intended to present it, and for this reason, I feared that he had unintentionally conveyed to you a wrong impression as to my reasons for advocating the finance committee's decision in the matter.

"Yours truly,                    Alfred I. du Pont, Vice President."

On the same day that this letter was written, a copy of it was sent to Pierre and William. Alfred's letter was written for the purpose of explaining to Coleman the position taken by him and William at the meeting of December 23d; but Coleman, hearing for the first time of the price of $125 a share suggested by the committee and having on the 13th written to Pierre offering to sell a large part of his holdings at $200 per share, apparently considers the letter a suggestion that he should now sell at $125 instead of $200 per share, and writes Alfred as follows:

"E. I. du P. de N. P. Co.

"Rochester, Minn., Feb. 19, 1915.

"Mr. Alfred du Pont, Wilmington, Del.—Dear Alfred: I am in receipt of your letter of February 16th, and have read it several times. I cannot, however, make out why you wrote it.

"To reiterate, the offer I made in December to sell 20,000 shares at $160.00 was made, as Pierre will tell you, at what I then considered, and now know, was a sacrifice to myself.

"In that proposition, I stated the stock would go to $200.00 early in 1915. Having made up my mind that it was wise to get the young men of the

company interested, I took the question up with Pierre, who agreed with me that it was a good thing for the younger men of the company, and, therefore, a good thing for the company. Pierre told me that you too had agreed it was a good thing. That it was a good thing, subsequent events have proven.

"A few days after my operation, Pierre advised me there was some misunderstanding in regard to this proposition and that you were not prepared to accept it, while I had fully understood before leaving Wilmington that you would accept it.

"I immediately wired Pierre to withdraw the proposition, unless he was, in some way, committed.

"In the third paragraph of your letter you say, 'The one point on which there seemed to be a difference of opinion was the question of price.'

"If you will have the date of my proposition to the finance committee looked up, you will find that the then accepted orders, and the money in 'our hands, was sufficient to make the stock have a book value beyond the price at which I offered it, and the earnings, by reason of the accepted orders, would make the 6½ per cent. you mention in your letter, look like 'a drink of water.'

"On the second page of your letter, you say, 'I believe it an excellent time to make an offer of this character to the employés at as low a figure, etc.'

"To guide me, won't you please advise how much of your common stock you are willing to let go at this time to the important employés, at price suggested by you, $125 per share. Probably I can join with you in an offer.

"The position that you take, that it is wiser to buy outstanding stock than to issue new stock, is, I think, a correct one.

"I am really sorry, but to be perfectly frank with you, I cannot understand the purpose of your letter to me.

"Yours sincerely,　　　　　　　　　　　　　　Coleman du Pont."

Meanwhile, on February 16th or 17th, Mr. Dunham, Coleman du Pont's agent, called upon Pierre and stated to him that he had authority to sell 20,000 to 40,000 shares of Coleman's stock. The terms of the offer made through Dunham were apparently the same as those contained in Coleman's letter of the 13th. Upon that point Pierre testifies:

"My recollection of the letter is that he stated he was still firmly of the opinion that it was a good thing for the company for the principal men of the company to be owners of a considerable amount of stock and for that purpose he was willing to sell, I think 20,000 to 40,000 shares. That was exactly what Dunham had stated to me."

He further testifies that Dunham was asked "whether, if T. C. du Pont sold a large amount, say 40,000 shares, he would be willing to pool the voting power with whoever bought the stock. He said he didn't know, but that he would communicate with T. C. du Pont."

At a directors' meeting on March 10, 1915, Mr. Connable, one of the directors, asked the question:

"As I understand, this stock was offered by Mr. T. C. du Pont for sale. It was offered on the general market. This syndicate knew of that fact and did not want to see the stock get into the hands of outsiders. They organized a group to acquire the stock. Is that correct?"

Pierre replied:

"Not exactly. I did not know that the stock was actually offered to anybody. It was not offered to the syndicate. The syndicate made a bid for it."

It is found as a fact that Coleman's offer to sell was a general offer to sell to any one who would buy, and that Pierre so understood it.

On February 17th, having Coleman's letter of the 13th and Dunham's verbal offer, Pierre showed the letter to John J. Raskob, the treasurer of the company, and one of its directors. Later on, Pierre, Raskob, Irenee and Lammot du Pont, Pierre's brothers, R. R. M. Carpenter, Pierre's brother-in-law, all directors of the company, had one or more conferences, at one of which A. Felix du Pont was present, the result of which was a decision that the six mentioned would endeavor to purchase a substantial block of Coleman's stock. Dunham sent a telegram to Coleman on the 17th as follows:

"Wire me if you will be willing to sell 40,000 shares and pool balance for voting purposes. Another proposition: Would you be willing to sell entire holdings; both cash.                                    L. L. Dunham."

Dunham reported to Pierre that Coleman replied that he would sell all of his holdings, but would not pool any part of them with those who purchased a part, unless he knew the conditions of the pooling agreement.

As a result of the conference, Raskob was sent to New York and called upon Mr. Porter, representative of J. P. Morgan & Co., at his office and endeavored to make arrangements with him for a loan to enable Pierre and his associates to purchase all of Coleman's stock. At that time Morgan & Co. were the financial agents for the allied nations at war. Through them, the Powder Company was transacting its business in the sale of munitions of war and carried a large deposit with them. Raskob stated to Mr. Porter that he and his associates contemplated buying all the shares of Coleman's stock, including 14,500-odd shares of preferred and 63,000-odd shares of common at about $200 per share for the common, and that they would like to borrow the difference between approximately $14,000,000, the total purchase price, and the amount that Coleman would take as deferred payment upon a note to be given to him. He proposed giving as collateral for the amount of the note which they would sell in New York to J. P. Morgan & Co. all the preferred stock purchased from Coleman and an amount of common stock which would margin the loan down to 50 per cent. Mr. Porter, after discussion of the proposition, left his office to make inquiries, and on his return told Raskob that he felt satisfied that at least $10,000,000 of the necessary $14,000,000 to buy the stock could be placed. An arrangement finally was made by which Pierre and Raskob were assured that the loan could be obtained. Pierre then sent to Coleman the following telegram:

"Wilmington, Del., Feb. 20, 1915.
"T. C. du Pont, Blackstone, Chgo.
"Have arranged final conference with bankers Tuesday and Wednesday propose purchasing your sixty three thousand two hundred fourteen common at two hundred and thirteen thousand nine hundred eighty nine preferred at eighty paying eight million cash and five million seven hundred sixty two thousand in seven year five per cent. notes of company to be formed collateral on notes to be thirty six thousand shares common stock we to have privilege of paying notes before maturity also prepared to close immediately do you accept this proposition has Dunham full authority and necessary power to act for you important this be kept confidential for present.                    Pierre."

To this telegram Coleman replied as follows:

"Chicago, Ill., Feb. 20, 1915.
"Pierre S. du Pont, Wilm., Del.
"Telegram received would rather keep preferred than sell at 80 think deferred payment should be at six per cent. March dividend to be adjusted have talked to Dunham and asked him to confer with you Dunham will be here Tuesday perhaps you would prefer to have me call you up then leave Wednesday.                                                            T. C. du Pont."

Pierre then sent the following telegram to Coleman:

"Wilmington, Del., Feb. 20, 1915.
"T. Coleman du Pont, Blackstone Hotel, Chgo.
"We accept your modifications to our telegram six per cent. on deferred payments and eight five for preferred stock. This makes deferred payment five million eight hundred thirty one thousand eight hundred sixty five dollars carrying the six per cent. Please write letter confirming details will be settled with banks on Tuesday.                   ·                       Pierre."

On the same day Pierre wrote Coleman as follows:

"February 20, 1915.
"Mr. Coleman du Pont, Blackstone Hotel, Chicago, Ill.—My Dear Coleman: I beg to confirm my telegram of to-day and your phone conversation:
(Then follows recital of Pierre's two telegrams of February 20th.)
"I understand I have purchased from you sixty-three thousand two hundred fourteen (63,214) shares of the common stock of E. I. du Pont de Nemours Powder Company at two hundred (200) dollars per share and thirteen thousand nine hundred eighty-nine (13,989) shares of the preferred stock of E. I. du Pont de Nemours Powder Company at eighty-five (85) dollars per share. Also, you are to be paid eight million (8,000,000) in cash and five million eight hundred thirty-one thousand eight hundred sixty-five (5,831,865) dollars in six per cent. (6%) seven (7) year notes of a company to be formed to complete this transaction; the collateral on the notes being thirty-six thousand four hundred fifty (36,450) shares of the common stock of E. I. du Pont de Nemours Powder Company. The company is to have the privilege of paying these notes before maturity. Until we have all the details arranged, I suggest that the transaction be kept confidential. I will let you know as soon as it is announced, which of course must be fairly soon. I have arranged for the loan in New York, but some details will have to be finished on Tuesday, February twenty-third (Monday being a bank holiday). I will arrange immediately with Lou Dunham for the transfers.
"Your affectionate cousin,                        Pierre S. du Pont."

On February 22d, Pierre sent the following telegram:

"Wilmington, Del., Feb. 22, 1915.
"T. C. du Pont, Blackstone Hotel, Chgo.
"Please wire acceptance of proposition my letter twentieth in order that we may have definite proposition for banks tomorrow.             Pierre."

To which Coleman replied:

"Chicago, Ill., Feb. 22, 1915.
"P. S. du Pont, Wilmn.
"Proposition accepted for entire holdings don't know exact number share assume collateral on deferred payments to be maintained relatively same as at start.                                                    Coleman."

Pierre and Raskob made the final arrangements with Mr. Porter in New York on February 23d. The arrangement is outlined in a letter as follows:

"February 24, 1915.
"J. P. Morgan & Co., New York City—Gentlemen: Attention of Mr. Porter. I wish to confirm my understanding of our conversation of yesterday.

We are incorporating the du Pont Securities Company under the laws of the state of Delaware with a capitalization of $7,500,000, which company will purchase 14,599 shares of the preferred and 91,491 shares of the common stocks of E. I. du Pont de Nemours Powder Company. The company will issue a seven year note of $5,903,715 to T. C. du Pont, carrying 36,900 shares of the common stock of E. I. du Pont de Nemours Powder Company as collateral. They will also issue note for $8,500,000 payable eighteen months after date, with interest at the rate of six per cent. per annum, to be sold by you at par. The collateral on this note will be 14,599 shares of preferred and 54,591 shares of the common stocks of E. I. du Pont de Nemours Powder Company, coupled with underwriting or guaranty agreement. The company is to have the right to renew this note for a further period of eighteen months at the same rate of interest. A commission of 1½ per cent. is to be paid on such part as may be renewed.

"Papers of incorporation are being prepared to-day by our counsel, Mr. William S. Hilles, who, with Mr. Raskob, will meet Mr. Prosser and counsel of the Bankers' Trust Company in New York to-morrow with a view to agreeing on all the forms of necessary resolutions, forms of notes, guaranty agreement, etc.; the intention being to file the certificate of incorporation on next Monday, at Dover, Delaware, and complete the transaction in New York on Tuesday, at which time the $8,500,000 cash will be available.

"The commission for your services in connection with this transaction will be $170,000, being 2 per cent. on the amount of the loan.

"Very truly yours,                                    Pierre S. du Pont."

Pierre, Irenee, Lammot, R. R. M. Carpenter, Raskob, and A. Felix du Pont, as subscribers, caused the incorporation of the du Pont Securities Company on March 1, 1915, with an authorized capital of $10,000,000. A loan of $8,500,000 was obtained through J. P. Morgan & Co. The stock purchased from Coleman, together with 28,277 shares of common stock contributed by Pierre and his five associates, was sold to the du Pont Securities Company for which Pierre and his five associates received $7,500,000 in stock of the Securities Company, $8,500,000 in cash represented by its notes sold to J. P. Morgan & Co., and about $5,900,000 represented by its notes to T. C. du Pont for the deferred payment. The transaction was closed with Pierre on the basis agreed upon. The $8,500,000 loan was distributed by Morgan & Co., after retaining part of it, among 14 banks, all of which were depositories of the Powder Company. The transaction with the banks was closed on February 23d. On that day the Powder Company was credited in its deposit account with J. P. Morgan & Co. with $5,500,000, on account of sales to foreign governments, which amount was immediately drawn out by the Powder Company's checks through Raskob as treasurer, and in large part distributed among the banks which participated in the loan, so that the deposits in participating banks were increased on the following day over those on February 23d, in round figures, as follows:

Mechanics' & Metals' National Bank, New York, from $191,000 to $369,000.

American Exchange National Bank, New York, from $199,000 to $591,000.

Bankers' Trust Company, New York, from $191,000 to $791,000.

First National Bank, New York, from $100,000 to $400,000.

National City Bank, New York, from $522,000 to $958,000.

Chase National Bank, New York, from $193,000 to $593,000.

Hanover National Bank, New York, from $195,000 to $595,000.

National Park Bank, New York from $190,000 to $590,000.

Empire Trust Company, New York, from $121,000 to $321,000.

Chatham & Phœnix National Bank, New York, not increased at that time but on February 23d the balance was $192,000 and within ten days had become $402,000.

Equitable Trust Company, New York, from $191,000 to $491,000.

National Bank of Commerce, New York, from $196,000 to $596,000.

The deposit in the Philadelphia National Bank was decreased on the 24th, but on the 25th was increased by over $100,000 and J. P. Morgan & Co.'s account which, on February 17th, stood at $527,000 had been increased on the 19th by over $2,400,000.

It is alleged in the bill that Pierre and his associates used the credit of the company to obtain the loan of $8,500,000 upon which to finance the transaction. Whether the loan could have been obtained from other banks, not depositories of the Powder Company, upon the security of the stock deposited as collateral, together with the individual guarantees of Pierre, Irenee, Lammot, Raskob, Carpenter, and Felix cannot be determined. It would be mere conjecture. What they did must be drawn from the evidence. The loan was negotiated by the acting president and treasurer of the Powder Company through a banking house having an intimate knowledge of the company's business, having large sums passing through its hands to the company and having a large deposit of the company's cash on hand and $5,500,000 coming in on the day of the transaction. The loan was distributed among the depositories of the Powder Company, and the deposits in at least 11 of the depositing banks were increased by enormous amounts out of the $5,500,000 of the company's cash the day after the loan was placed through checks drawn upon J. P. Morgan & Co. That firm knew that those obtaining the loan included the acting president, the treasurer, and directors of the Powder Company. The collateral consisted of a very large block of the stock of the company and the Securities Company, the maker of the note, was obliged to meet it, if at all, out of dividends derived from that stock, as it had no other source from which to meet its obligations. Those dividends would have to be declared by the action of a board of directors of which the parties to the syndicate were officers and members. Under these circumstances, it would be placing motives, reasons, and conclusions of witnesses on a higher plane as evidence than facts to conclude that those officers did not use the advantages derived from the company's financial standing from their official connection with the company and from the deposit of its funds in obtaining the credit upon which the loan was based.

[2] Upon learning of the transaction Alfred and William promptly made objection. On March 2d William du Pont sent the following telegram to Pierre:

"Paper states you have purchased Coleman's stock. I presume for the company. Any other action I should consider a breach of faith."

Alfred I. du Pont expressed to Pierre verbally a similar opinion. On March 2d, the date of William's telegram, Alfred invited Pierre to come to his office and asked him concerning the purchase of the stock.

Upon being informed of the details of the arrangement with J. P. Morgan & Co. and that Pierre proposed to divide the stock among the stockholders of the holding company, Alfred testifies:

"I then said to him: 'Pierre du Pont, don't do this. It is wrong.' He asked me why it was wrong. I said: 'Because you have accomplished something by virtue of the power and influence vested in you as an officer of the company, and by knowledge which you could only have acquired in your official capacity, which you could not have accomplished as a private individual. For that reason the stock which you have acquired in this matter does not belong to you but belongs to the company which you represent. I therefore ask you to turn this stock over to the company.' He said he was very sorry that he could not agree with my point of view. In a further endeavor to get him to make some concession along my line of thought, I said: 'Pierre, your father and my father were brothers. Neither of those men would have approved, I am confident, of what you have done. For their sake, as well as for your own, put that stock in the company's treasury, because you can't afford to do anything that will invite criticism or condemnation on the part of any of your fellow bankers which would in any way injure your business reputation.' I said, 'Pierre, I ask you.' He said he could not do it, that the thing was an accomplished fact and could not be undone. I said, 'Then you refuse to make this concession which I ask of you?' He said, 'I do.' That terminated the interview."

On the evening of March 3d, Alfred, William, Alexis, Philip, Eugene E., Francis, Irenee, and Pierre met at Alfred's office and discussed the subject of Pierre's acquisition of the stock and the propriety of the manner in which it had been acquired, and a reiteration was had of the position which Alfred took on March 1st that Pierre owed it to the company to turn the stock into the company's treasury. William also urged that Pierre turn the stock into the company, stating that he had purchased it in his official capacity, and he (William) would consider any other disposition of the stock an infringement of the proprieties of his office and a breach of faith as an officer of the company.

Neither Alfred nor William at that time took the definite position that Pierre had taken advantage of negotiations which had been pending under Coleman's offer considered by the finance committee on December 23d. They did not in fact know that Pierre had conducted the negotiations, as they had no information upon that subject except what they had derived from Pierre at the meeting of the finance committee on February 10th, when they both believed that Pierre had misunderstood the instructions of the finance committee and believed, as he stated to them at that time, that he considered that the offer had been finally rejected at the meeting on December 23d. In their position at this time, they, being ignorant of the facts and kept in ignorance by Pierre, based their charge of bad faith and breach of trust on Pierre's part upon the fact, which they believed, that he as an official of the company had used the company's credit to buy the stock and had used information obtained by virtue of his office of the value of the stock, and of the fact that the stock was for sale, for his own advantage when he should have acted for the advantage of the company.

Pierre, having declined to turn the stock over to the company, consulted Mr. Laffey, counsel for the company, who informed him that, in his opinion, the company could not lawfully purchase the stock, be-

cause under its charter, and under the laws of New Jersey, it could not purchase its own stock except out of its surplus.

The purchase price of the stock amounted to $13,903,715, which was in excess of its surplus, as shown in the statements of the financial condition of the company as of February 28, 1915, under the item "profit and loss," $5,303,599.82, at that time, over and above all of its liabilities, including in that term those fixed, current, and contingent, and the amount of capital stock paid in.

Pierre then addressed to each of the board of directors of the Powder Company a letter dated March 5, 1915, stating that he, together with others, had arranged to purchase Coleman's stock; that Coleman had written to him before Christmas offering 20,000 shares of common stock to the company at $160 per share with the suggestion that the stock be resold to the important employés. He then cited the resolution from the minutes of the finance committee meeting of December 23, 1914, and stated that this information was transmitted to Coleman, who withdrew his offer very shortly afterwards; that about the middle of February Alfred brought up with the finance committee the subject of purchase of this stock and expressed the opinion that Coleman had not understood the position of himself and William on the question and suggested that both he and William should write to Coleman outlining their position; that this was done by Alfred in his letter of February 16th, of which he attached a copy. He stated that this letter most clearly outlined the position of the majority of the finance committee at the time of the meeting and amplified the minute of the meeting; that on the same day, February 16th, he learned from Coleman's confidential representative that Coleman was planning to sell a large block of his stock, and, as the company was not interested, he felt at liberty to sell elsewhere; that this resulted in a negotiation on February 17th, and the offer to purchase was made and accepted on February 20th; that the final details were finished on March 2d. He then recited the telegram from William of March 2d, stating that Alfred had expressed to him a similar opinion. He stated that, in taking exception to the accusation of bad faith, the meaning attached to these words is as follows:

"I could not have made the purchase of this block of stock unaided by the company; that therefore the company is entitled to the stock. There seems to be no contention that my position in the company enabled me to receive an offer from Mr. T. C. du Pont; the point being that I could not have financed the purchase of the stock without using company credit. I have no reason to think that I am accused of any improper use of credit, but of having used my position to enable me to obtain credit in New York that as an individual I could not have obtained. Messrs. Alfred I. and William du Pont, who have expressed this opinion most strongly, admit that they know neither the amount of the loan, the nature of the collateral used, nor the terms of the transaction. I have given them the following information:

"That a loan was placed through J. P. Morgan & Co. with whom our company first had relations by opening an account on December 9, 1914. Messrs. J. P. Morgan & Co. undertook to place this loan in their usual manner, namely, for a commission. They selected a number of banks and distributed the loan among them. After the transaction was completed, we were made acquainted with the names of the banks who took the loan. The latter was about 50 per cent. oversubscribed, and it was so far distributed that Morgan & Co. had not

retained more than 10 per cent., i. e., the allotments to banks amounted to more than 90 per cent.

"I declare that neither I, nor any of my associates, have used or attempted to use the company's name in this transaction. I have been greatly surprised that Messrs. Alfred and William du Pont consider that the company has in any sense the right to take this stock, and still more surprised that some others of our directors have at least entertained such a feeling, if they do not now possess it. The object of this letter is to endeavor to settle satisfactorily in everybody's mind the question of propriety by inquiring whether the directors wish to purchase the stock for account of the company."

He then gave the company the opportunity to make an offer to him and his associates, withdrew the statement made on the evening of March 4th that he would not sell the stock, and stated he was now open to consider a proposition. He stated that the purchase, which had been finally closed beyond any power to change, was such that the whole of the 63,314 shares of common and 14,599 shares of preferred stock purchased from T. C. du Pont was open to the company's offer of purchase; that the price paid was $200 per share for the common and $85 per share for the preferred, and any offer made for the purchase of common stock must be subject to an outstanding option to purchase 8,234 shares of common stock for $1,139,600, or approximately $138 per share, and that, in order to undo what had been done, an expenditure of approximately $250,000 would be necessary.

The matter was brought before the board of directors at a meeting on March 6, 1915. Those present were Pierre, Alfred, William, Irenee, Eugene E., Lammot, Francis I., Alexis I., and H. F. du Pont, R. R. M. Carpenter, H. G. Haskell, Raskob, H. F. Brown, F. L. Connable, William Coyne, Henry Belin, Jr., Charles L. Patterson, and E. G. Buckner. Mr. Laffey was called into the meeting at Pierre's suggestion for advice as to the legal phase of the matter. He gave it as his opinion that the company was limited in its right to purchase its own stock to the amount of its surplus. A resolution that the company offer to purchase the stock from Pierre and his associates, in accordance with the terms stated in Pierre's letter of March 5th, was then offered. Upon a substitute motion the matter was referred to the finance committee for report and recommendations on March 10th. At this meeting of March 6th, T. Coleman du Pont's resignation was received. Pierre was elected president, and A. Felix du Pont a director. Pierre was appointed chairman of the finance committee, and Irenee elected to the vacancy on that committee caused by Coleman's resignation.

A meeting of the finance committee was held on March 8th, at which were present Pierre, Alfred, William, and Irenee. Upon a motion to recommend that the board of directors make an offer to purchase the stock from the syndicate in accordance with the terms stated in Pierre's letter, Alfred and William voted aye and Irenee voted nay. Pierre did not vote. Under the by-laws governing the finance committee, the motion therefore failed to pass. At the directors' meeting on March 10th, the report of the finance committee without recommendation upon the resolution referred to them at the meeting of March 6th was received and filed without any further action. Raskob offered a resolution that the company make an offer to purchase from the syndicate the stock

referred to in the letter from P. S. du Pont dated March 5th upon the terms stated therein. Upon being put to a vote, the motion was lost; Alfred, William, and Francis voting in the affirmative, Mr. Connable not voting, the other members present, including Raskob, voting in the negative. Nineteen directors were present at the meeting. The board consisted of twenty members in office, and the by-laws provide:

"The affirmative vote of a majority of all the directors for the time being in office shall be necessary for the passage of any resolution."

It therefore would have required the vote of eleven directors to pass the resolution. Of those present and voting, the following had an interest in the stock: Pierre S. du Pont, Irenee du Pont, Lammot du Pont, A. Felix du Pont, John J. Raskob, and R. R. M. Carpenter, as members of the syndicate who joined in the purchase of the stock. Coyne, Haskell, and Brown had each received from Pierre a promise of 1,500 shares of the stock of the du Pont Securities Company. After the vote had been taken, Laffey was elected a director. Prior to this meeting, he had been promised 500 shares of stock in the Securities Company.

The defeat of the resolution to offer to purchase the stock is relied upon by the defendants as a ratification of the purchase by the syndicate and as a rejection by the board of directors of an opportunity to make an offer. Alfred and Francis protested against the directors who were interested in the Securities Company voting upon the acquisition of the stock. At that time it was not disclosed to the directors who were not interested that Haskell, Brown, and Coyne had an interest at that time in the Securities Company, nor that Laffey, prior to the meeting of March 10th, had been promised an interest. Pierre's letter, in which he made the proposition to the company, failed to disclose the negotiations which he had had with Coleman du Pont during January, 1915, failed to lay before the directors the correspondence between himself and Coleman, and it failed to set out the terms of Coleman's offer of February 13th and to state what was done in the negotiations after that time. While he evasively stated the fact that the "company's name" had not been used in obtaining the loan, he did not state that the banks which took the loan were depositories of the company, having with one exception large balances of the company's funds upon deposit; nor did it state the names of the banks, although he knew them at that time. It was at Pierre's suggestion that Laffey was called into the board on March 6th to give his opinion upon the legality of the purchase of the stock, which Pierre, on March 5th, had obtained in advance. If Pierre and the other directors interested in the purchase of the stock had in good faith intended to obtain fair unbiased consideration of the resolution offering to purchase from them, there should have been laid before the board a full and unreserved disclosure of the whole truth in relation to the action of the finance committee in relation to the information given by Pierre to Dunham and Coleman of that action, in relation to the negotiations conducted by Pierre with Coleman up to the time the purchase was consummated, and in relation to all the details of the loan of $8,500,000. Nine directors had an interest antagonistic to the company's acquisi-

tion of the stock. Alfred, William, and Francis, through the conceal-ment from them of the true state of facts, based their support of the resolution upon the ground that Pierre and his associates had acted in bad faith in using their official knowledge of the company's business and in using the credit and financial standing of the company in ob-taining the funds to finance the purchase. It was the duty of Pierre and his associates to see that there was made to them, together with Mr. Connable, who did not vote, and the six other directors who voted with the nine interested directors, a full disclosure of all the facts and circumstances in connection with the whole transaction. While the action of the board of directors therefore constituted a formal re-fusal to take advantage of the opportunity to make an offer to Pierre and his associates to take the stock for the company, that action was obtained by the votes of nine directors who, at that time, were inter-ested in preventing the company from acquiring the stock, and of six others who were kept in ignorance, through willful misrepresentation and suppression of facts they were entitled to know. To uphold the action at the board meetings of March 6th and 10th, under these cir-cumstances, would be contrary to conscience and good morals and to the rule of equity forbidding a director, while representing the cor-poration, from acting in his own interest and against the interest of the corporation and requiring a full disclosure by a director as a fiduciary of everything which he himself knows bearing upon the matter in hand.

[3] After the suit was brought on January 18, 1916, the board of directors of E. I. du Pont de Nemours Powder Company and the E. I. du Pont de Nemours & Co., the directors being the same in each company, sent a circular letter to the stockholders of the two com-panies reciting the fact that on December 8, 1915, Philip F. du Pont had brought the present suit. The names of the individuals accused of defrauding the company for their personal gain and violating their duty as directors were given, and copies of the bill of complaint and the answer of Pierre S. du Pont were inclosed, and it was requested that the stockholders carefully read the inclosures. It then recited Cole-man's offer to the company of December 7 and 14, 1914, and stated that the finance committee on December 23, 1914, had instructed Pierre to advise Coleman that the committee did not feel justified in paying more than $125 per share; that Pierre urged that the offer as made be accepted and voted against its rejection; that Coleman withdrew the offer after being advised by Pierre of the attitude of the finance com-mittee; that a month later Pierre and others, learning that Coleman was willing to sell all of his holdings in the company, made him an offer, and he and his associates had purchased these shares for their own account at $200 per share for common and $85 for preferred. It stated that Philip du Pont's statement that Pierre and his associates did not have either credit or marketable collateral which would enable them to effect the loan in that amount, and therefore could not finance the purchase of the stock of Coleman without using the credit of the Powder Company, was entirely unwarranted by the facts as fully set forth by Pierre in his answer; and that, objection being raised to the purchase by two of the directors of the company, Pierre, without ad-

mitting or conceding any obligation so to do, expressed to the board of directors a willingness to entertain an offer for the stock.

It then recited the action of the board at its meeting on March 10, 1915, and the opinion of the attorney of the company that, since there was not sufficient surplus in the treasury for the purpose, the purchase of the stock would be illegal. It recited that, after receiving notice of the suit, the president called together the board of directors to learn their wishes in the matter, and that they immediately passed a resolution of confidence in the accused officers and directors and, by a vote of 16 to 3, disclaimed on behalf of the company any right or interest in the stock in question, which resolution was set out at length. The subscribers to the circular letter stated that they owned or represented by proxy at that time over 55 per cent. of the total voting stock of the E. I. du Pont de Nemours & Co. and asked that proxies be given to Pierre, Alexis and John J. Raskob, authorizing these men to vote at the next annual election to be held on the thirteenth day of March, 1916, in Wilmington, Del., to elect a board of directors for the coming year. Twenty-one names were then set out as candidates for election to the board of directors.

At the annual meeting referred to, held on March 13, 1916, the board of directors named in the communication were elected, and the proxies were also used in voting for and adopting a resolution which is set out at large in the defendants' seventy-third request for findings of fact. The resolution contained a statement of the transaction in relation to the purchase of the Coleman du Pont stock substantially as narrated in Pierre's letter to the board of directors of March 5, 1915, and recited the action of the board of directors and approved of the policy of the board in refusing to offer to purchase the Coleman du Pont stock and expressed approval of the policy of applying the money and assets of the corporation to the carrying on of ordinary business rather than purchase of stock of the company except when bought out of surplus for bonus or other similar legitimate purposes. It also approved the sound business judgment of the directors in the declaration of dividends.

As a ratification of the act of the board in refusing to offer to purchase Coleman's stock from Pierre and his associates, or a condonation of the fraud practiced by Pierre and his associates, or approval of the policy of the board, the resolution cannot be accepted as expressing the views of the stockholders whose proxy votes were obtained by means of the circular letter. The letter requested proxies for the purpose of voting for directors and not for the purpose of acting upon the resolution, and further, is open to the same objections of failure to make full disclosure as is the letter of Pierre to the directors. It is difficult to see on what ground the stock representing that purchased from Coleman can be regarded as properly included in a vote upon such a question. Every principle of honesty and rule of propriety and fair dealing would require that it be not voted. If Pierre and his associates, through breach of the good faith which he, as agent for, and all as directors and officers of, the company, were bound to observe in their relations with the company, cannot hold the stock unless the company has had a fair opportunity to purchase it, it follows that

it cannot be turned against the company by voting it to sustain the unlawful methods of those so obtaining it. Neither the action of the board of directors on March 10, 1915, nor the action of the stockholders on March 13, 1916, has any weight as against the company and its stockholders in condoning the action of Pierre and his associates, or ratifying that of the board of directors, or in determining that the company had rejected an offer to purchase the stock.

[4] It is averred in the answers of the defendants and vigorously contended in most able argument of their counsel that the company could have purchased Coleman's stock only out of its surplus which, upon February 28, 1915, it is claimed, amounted to $5,303,599.82, while the amount required for the purchase was $13,903,715, and that the use of any other funds would have impaired its capital stock. A statement of the financial condition of the Powder Company as of February 28, 1915, showed that it had in hand cash amounting to $15,773,-496.09, and added to that bills receivable, accounts receivable, materials and supplies, finished products, and deferred charges, making a total working capital, consisting of the quick or fluid assets available for carrying on its current commercial and manufacturing business, amounting to $40,757,045.82. Investments added to this brought the total current assets up to $54,464,884.01. The current liabilities consisting of bills payable, accounts payable, bond interest and dividends payable, and deferred credits, amounted to $4,669,515.62, leaving an excess of current assets of $49,795,368.39. The fixed or stable assets consisted of plants, real estate, construction, fixtures, etc., amounting to $24,199,640.18, and patents, good will, etc., $22,320,306.02, making the total assets, less current liabilities, $96,315,314.59. Contract advances amount to $23,903,202.56, and funded debt $17,354,000. These two items, together with reserves for depreciation, amortization, etc., amount to $45,545,630.88, which, deducted from the above balance, leaves an excess of assets of $50,769,683.71, after deduction not only of current liabilities, but fixed liabilities, consisting of funded debt and reserves for depreciation, etc., and the total of the contract advances. Deducting from this excess of assets the capital stock, consisting of preferred amounting to $16,068,801.34 and common, $29,-397,282.55, leaves profit and loss or surplus at the figure above stated $5,303,599.82.

The amount of contract advances, which apparently is absorbed in the current assets, is deducted as a whole from the assets of the company. These contract advances represent 50 per cent. of the contract price, paid in advance by the foreign governments at war, upon the total amount of their contracts entered into with the Powder Company from time to time for the purchase of munitions of war. On December 31, 1914, the contract advances in hand amounted to $7,-947,711.87; on January 31, 1915, to $14,657,646.51; on February 28, 1915, at the time Pierre purchased Coleman's stock, to $23,903,202.56; and on March 31, 1915, to $30,771,053.49. There was a constant increase in the amount of the contract advances in hand until, on September 30, 1915, they amounted to $85,494,332.91.

The average cost of manufacture of rifle powder and cannon powder was agreed to by the parties and filed as a stipulation in the cause.

242 F.—9

The amount of the contract advances assured the Powder Company of a substantial profit upon each contract over the cost of manufacture in case the buyers refused or failed to accept any lot or the whole amount called for under any contract, or failed to pay the remaining 50 per cent. of the contract price, and the powder was left upon the company's hands.

It has been seen that the surplus which appears under the item of "profit and loss" is arrived at by deducting from all current assets, investments, and fixed assets, not only the current liabilities and the fixed liabilities, but, as a contingent liability, the amount of cash advanced upon the contracts. It may be that that item was properly deducted in order to ascertain the surplus as a bookkeeping term, but in reality the amount of the current assets of the company which could be used without impairing its capital stock paid in is to be determined by a comparison of all of the assets of the company, including all of its quick or fluid assets available as working capital, with its actual indebtedness over and above its capital stock. The amounts advanced to it upon these contracts did not constitute an indebtedness, but there was a contingent liability based upon the agreement in the contracts that upon the failure of performance upon the part of the seller caused by failure of powder to conform to contract requirements or by any contingencies beyond its control by strikes, or labor trouble, the Powder Company would be required to return to the buyer such amount of money as may have been advanced on account of the powder so affected.

At the time Coleman's stock was purchased by Pierre on February 28, 1915, the contracts had increased in amount from $18,292,225 on December 31, 1914, to $58,932,225. Additional contracts for enormous amounts were being negotiated at that time, so that by the end of March the contracts exceeded $90,000,000 and by the end of September exceeded $225,000,000.

During the period covered by Pierre's correspondence with Coleman, it appears that the manufacturing plant was increasing its capacity sufficiently to successfully meet every requirement of its enormously increasing business. The predictions of Coleman as to increase in the value of the stock were realized and there was a confidant expectation of profits of 100 per cent.

The defendants' witnesses testified as to the risks attending performance of the contracts based on the uncertainty of the plant being capable of the required production. The statements made by the officers and directors of the company during the period in question bear a different inference from their testimony on the stand. The correspondence between Coleman and Pierre and the discussion at the meetings of the board of directors in March carry conviction that the company was fully able to produce and was producing all that was necessary to carry on the business, and that huge profits were to be made out of the business on hand. Between March 1, 1915, and the time of the trial in July, 1916, cash dividends equivalent to 183 per cent. had been paid upon the stock of the Powder Company. At the time of the meeting of the board of directors of March, 1915, it was stated by Pierre that the surplus out of which alone Mr. Laffey advised the

board the stock could be purchased amounted to $9,500,000. In addition to what was, in the bookkeeping sense, called surplus, the company had in hand amply sufficient sums to purchase the stock without impairing the capital stock paid in, unless the total amount of the advances constituted an indebtedness.

Mr. Laffey's opinion was based upon paragraph 7, § (h), of the charter, and section 30 of the corporation law of New Jersey. The charter contains the following provision:

"3. The objects for which this corporation is formed are: * * * (f) To subscribe or cause to be subscribed for, and to purchase or otherwise acquire, hold for investment, or otherwise sell, assign, transfer, mortgage, pledge, exchange, distribute or otherwise dispose of the whole or any part of the shares of the capital stock * * * of itself or any other corporation or corporations. * * *

"7. * *, * In furtherance but not in limitation of the powers conferred by law, the board of directors are expressly authorized: * * * (h) From time to time to fix and determine and to vary the sum to be reserved over and above its capital stock paid in as working capital before declaring any dividends among its stockholders; to direct and determine the use and disposition of any surplus or net profits over and above the capital stock paid in; to fix the time of declaring and paying any dividend, and, unless otherwise provided in the by-laws, to determine the amount of any dividend. All sums reserved as working capital or otherwise may be applied from time to time to the acquisition or purchase of its bonds or other obligations or shares of its own capital stock or other property to such extent and in such manner and upon such terms as the board of directors shall deem expedient, and neither the stock, bonds or other property so acquired, shall be regarded as accumulated profits for the purpose of declaring or paying dividends unless otherwise determined by the board of directors; but shares of such capital stock so purchased or acquired may be resold, unless such shares shall have been retired for the purpose of decreasing the company's capital stock as provided by law."

Under the charter, therefore, one of the objects of the corporation is the purchase of its own stock. Paragraph 7, § (h), confers upon the board of directors authority "in furtherance but not in limitation of the powers conferred by law." The first of the powers in section (h) is to fix and determine and to vary the sum to be reserved over and above its capital stock paid in as working capital before declaring any dividends among the stockholders, and the second is to direct and determine the use and disposition of any surplus or net profits over and above the capital stock paid in. In considering the effect of the paragraph providing that "all sums reserved as working capital or otherwise may be applied from time to time to the acquisition or purchase of * * * shares of its own capital stock," counsel for the defendants contends that this provision of the charter limits the investment of the company's funds to the sums reserved as working capital by action of the board over and above its capital stock paid in, and that hence the company could not use any part of its working capital in the commercial sense, consisting of its quick or fluid assets at that time amounting to over $40,000,000 for the purchase of its own capital stock. I do not, however, so construe the charter provision. The power conferred by the first clause of section (h), when read in connection with the whole of the section, confers authority to set aside out of the company's surplus before declaring dividends a sum as working capital, but it does not restrict the company's work-

ing capital to the sum so set aside. It does not mean that the company shall not use any of its quick or fluid assets as working capital, except the sum so reserved, but that, in order to justify the board of directors in not distributing its entire surplus in dividends, its previously existing working capital, if any, is to be added to by the sum so reserved. The forms in use by the company recognize working capital in the commercial sense and not in this restricted sense. The authority to acquire or purchase out of "all sums reserved as working capital or otherwise" is not confined to its capital stock, but includes "its bonds or other obligations," "or other property," and the provision that "shares of such capital stock so purchased or acquired may be resold" should be read in connection with the direction that neither the stock, bonds, nor other property so acquired shall be regarded as accumulated profits for the purpose of declaring or paying dividends. The board of directors are therefore expressly authorized to invest in the things enumerated including the company's capital stock all such sums as shall be reserved as working capital or otherwise, but the directors are not limited to the use of the sums so reserved for the purchase of its capital stock to the exclusion of the use of other funds of the company. The authority to so invest is expressly declared to be "in furtherance but not in limitation of the powers conferred by law." As the directors are authorized to purchase the company's bonds or other obligations or shares of its own capital stock or other property and are not confined to investment in its capital stock, it would follow that, if the provision is construed to mean that the funds the board may use in the purchase of its capital stock are to be confined to the sum so reserved, the same limitation would apply to its bonds, or other obligations, or other property purchased by it. This would lead to the absurd conclusion that, if the company had in its working capital large amounts of cash on hand without having any such sums reserved, it could not, if it found it to its advantage to do so, purchase its own bonds or notes before maturity or any other property for investment.

It is concluded that the section of the charter cited authorizes certain purchases to be made with the sums set aside out of surplus, but does not exclude the use of other funds of the company in making such purchases.

As the powers conferred upon the board by paragraph 7, § (h), are declared to be "in furtherance but not in limitation of the powers conferred by law," the corporation laws of New Jersey of 1896 (P. L. p. 277), under which the Powder Company was organized, will be examined.

Section 1, subd. 4, and section 20, provide:

"Every corporation shall have power: * * * (4) To hold, purchase and convey such real and personal estate as the purposes of the corporation shall require. * * *

20. The shares of stock in every corporation shall be personal property."

In Berger v. United States Steel Co., 63 N. J. Eq. 809, 53 Atl. 68, decided by the Court of Errors and Appeals, it was said:

"In Chapman v. Ironclad Rheostat Co., 33 Vr. (62 N. J. Law) 497 [41 Atl. 690], Mr. Justice Dixon, in an opinion delivered in our Supreme Court, very

clearly demonstrates that, under the Corporation Act of 1896, there is an implied grant of power to corporations to purchase shares of their own capital stock whenever such purchase is required for legitimate corporate purposes. Section 20 makes such shares personal property; section 1, subd. 4, gives power to purchase such personal property as the purposes of the corporation shall require, except what is excepted in section 3, which exception does not include shares of its own stock. Therefore, in connection with sections 29 and 38, the right of a corporation to purchase its own shares is necessarily implied."

Section 30 of the New Jersey Corporation Act (2 Comp. Stat. 1910, p. 1617) is relied upon by the defendants as preventing the acquisition of its own stock except from surplus. The section reads:

"The directors of a corporation shall not make dividends except from its surplus, or from the net profits arising from the business of such corporation, nor shall it divide, withdraw, or in any way pay to the stockholders or any of them, any part of the capital stock of such corporation, or reduce its capital stock except as authorized by law." (Then follow the penalties imposed upon directors for violation of the provisions of this section.

No case appears to have come before the courts of New Jersey in which this statute was held to prohibit a corporation from the purchase of outstanding shares of its own stock. It is construed by counsel for the defendants as applying to the present case upon the ground that the proposed transaction would have been a payment to Coleman or Pierre of part of its capital stock (that is, its paid-in capital), in payment for the shares. It is difficult to see the application of the section to the situation in this case. Even if it is to be construed as meaning that a corporation may not impair or deplete its capital stock by the purchase of its own shares, the reasons of the statute law and the common law for such a prohibition are that the paid-in capital represents to the creditors the assets of the company to which they may have recourse for payment of the company's debts, and, if the company has to use its paid-in capital in order to make payment for its own stock, it is preferring its stockholder as a creditor, and, to the extent to which the paid-in capital is used, it is depleting the fund to which its other creditors are to look for payment. Assuming that the act is intended to reach such a case, it is incumbent upon the defendants to show that the capital of the company over and above its capital stock paid in was not sufficient to pay its then existing creditors, and also to pay for the stock. In taking under consideration the question, it may first be concluded that surplus in the bookkeeping sense in which it was used upon the sheets or forms furnished by the Powder Company is not necessarily its surplus in the sense of representing what would remain out of its assets after deducting the full amount of its capital stock paid in plus its indebtedness. Its current liabilities were but $4,669,515.62, and its funded debt, which had many years to run, $17,354,000. Its capital stock amounted to $45,466,083.89. Adding its capital stock, its total current liabilities, and its funded debt, the sum of its capital stock and what it owed its creditors amounted to $67,489,599.61, which, deducted from its total assets of $100,984,834.-21, left it on hand a balance of current assets of $33,495,230.60. The purchase of the Coleman du Pont stock, therefore, would have left the company in hand over and above its liability for capital stock and its

liability to its creditors nearly $20,000,000, and deducting the reservation for depreciation, amortization, etc., which good business policy impelled the company to set aside, over $15,000,000 would have been available for contingent liabilities arising under its contracts. The materials and supplies on hand, together with the finished products, were valued at over $9,500,000. As these items may be assumed to have been in part at least what was on hand for carrying out the contracts at their value at the plant, and would have been on hand at that time if at that moment the war had ceased, the Powder Company was protected, not only by the advances upon which it would not have to encroach, except upon the contingencies named in its contracts, but it had the additional protection of materials and supplies and finished products at its disposal. The advances were unquestionably used in part, at least, as working capital which, on February 28, 1915, amounted to $40,757,045.82, and the company would still have had a large working capital if it had paid for the stock out of that item, and it cannot, upon any reasonable inference, be found that the purchase would have impaired the capital stock paid in.

It is concluded, therefore, that the company had ample power to purchase its own stock under its charter and under the corporation laws of New Jersey, and that it had ample assets on hand out of which it could lawfully have paid for the stock without depleting its paid-in capital.

The question whether the company should purchase the stock offered in December, 1914, was pending before a committee of the board of directors having full power and authority to represent and act for the corporation in the matter.

Under the by-laws of the Powder Company, it is provided in article 3, § 3:

"The finance committee shall have special and general charge and control of all financial affairs of the company and such other matters as may be assigned to it from time to time by the board of directors. * * *

"During the intervals between the meetings of the board of directors, the finance committee shall possess and may exercise all the powers of the board of directors in the management of the financial affairs of the company, and such other matters as may be assigned to it from time to time by the board of directors, in such manner as said committee shall deem to be best for the interests of the company, in all cases in which specific directions shall not have been given by the board of directors.

"During the intervals between the meetings of the finance committee, the chairman thereof shall possess and may exercise such of the powers vested in the finance committee as from time to time may be conferred upon him by resolution of the board of directors or of the finance committee."

Therefore, when Pierre was instructed to advise Mr. L. L. Dunham, attorney for Mr. T. Coleman du Pont, that the finance committee did not feel justified in paying more than $125 per share for this stock at that time, and to take the matter up further with T. Coleman du Pont, and that action was ratified and confirmed by the board of directors on December 30th, the corporation, through the committee upon whom the power was conferred, had taken this position upon Coleman's offer: It had not accepted or rejected the offer, but had placed the matter in the hands of its chairman for further negotiation upon his part with Coleman. It thereupon became his duty by virtue of

the special agency vested in him by the action of the finance committee to take the matter up further with Coleman and to fully inform Coleman in accordance with the terms of his instructions and necessarily to keep the finance committee informed of what was going on between himself and Coleman. The question before the finance committee was whether it should or should not acquire the stock. Coleman had offered it at a certain price, and the action of the finance committee cannot reasonably be construed as other than making a counter offer. With these instructions before him and this duty upon him, Pierre violated that duty by informing Dunham, according to his own statement, that the offer had been rejected, but did not give Coleman the information at that time that the finance committee was willing to buy the stock at a lower price than offered by him. He, however, kept the matter open with Coleman through his correspondence until Coleman, not knowing that there was any counter offer, instructed him to withdraw the offer with a view of renewing it in the future. His action, when the question was put to him on February 10th and he informed Alfred and William that the offer had been "turned down" on December 23d, and when they asked for the correspondence between him and Coleman and he furnished them with correspondence upon another subject, and when his attention was called to that fact by Alfred on February 12th he still failed to furnish the correspondence which was wanted, cannot be reconciled with anything but an intention on his part to conceal from them what had transpired. This conclusion becomes irresistible when we find that on the following day, February 13th, Coleman wrote the letter offering to sell from 20,000 to 40,000 shares of stock. The finance committee had not determined that it would purchase the stock, but this fact can make no difference in Pierre's duty to faithfully represent the company under the instructions from the finance committee in his dealings with Coleman and to make full disclosure to the finance committee of what transpired between him and Coleman. If he had with fidelity carried out his trust, had correctly reported to Coleman the substance of his instructions from the finance committee, and had fully and freely disclosed to the finance committee what had transpired between him and Coleman, and the finance committee or the company had determined to proceed no further, or had determined not to purchase Coleman's stock, his position of agency and trust for the company would have been at an end and he would have been free to act for his own interests and those of his associates. Having failed to do this and having purchased the stock, he did not offer to turn it in to the company, or to permit it to purchase it, but did give it an opportunity to make him and his associates an offer to take it, not, however, upon the terms under which he had purchased it from Coleman, but under terms involving the necessity of the company making good, obligations which he and his associates had entered into in the meantime with third parties and other directors of the company in relation to the stock. This opportunity to make an offer to sell to the company, if made in good faith, involved a duty upon Pierre's part and upon the part of the officers and directors associated with him in interest in the purchase at that time to make a full disclosure to the board of direc-

tors of all that had previously transpired in relation to the stock so that they might be fully informed of what rights, if any, the company had in the matter, or what its opportunity to purchase had been. No such disclosure was made to the board. Although the board was informed that Pierre and five other directors had an interest in the stock, the fact that three others were also interested was not disclosed. With nine directors having an interest antagonistic to the corporation and voting, it was therefore a certainty that a resolution to buy the stock could not pass, even if all the rest had been in favor of it, because the board at that time consisted of twenty members, and it required a majority vote of those in office to pass the motion. The subsequent resolutions at the stockholders' meeting, as has been shown, were passed by proxy votes given for election of directors. While the proxy votes were given for the election of a board friendly to Pierre and his associates and recommended by them, this cannot be construed as an indorsement of all that Pierre and his associates had done and of the prior action of the board because of a further failure to fully disclose to the stockholders the circumstances under which the stock had been purchased. Moreover, the stockholders receiving the communication were informed that the subscribers to the letter owned in person, or represented by proxy over 55 per cent. of the total voting stock of E. I. du Pont de Nemours & Co. and were not informed that the stock in controversy was included in that 55 per cent. ·Under the facts, therefore, what was done at these meetings cannot have any force and effect as valid action on the part of the board of directors, or the stockholders at these meetings.

[5] The duties of a director or other officer of a corporation in transactions where he is representing his company are governed by well-established and familiar rules of equity. A director of a corporation may freely purchase its stock, and occupies no relation of trust to an individual stockholder which prohibits his using whatever advantage his position may · afford him through knowledge of its business and condition superior to that of the stockholder with whom he deals. He is not accountable to the stockholder for withholding information from him which affects the value of the stock, but to the corporation, the whole body of stockholders, he stands in a fiduciary relation which requires him to exercise the utmost good faith in managing the business affairs of the company with a view to promote, not his own interests, but the common interests, and he cannot directly or indirectly derive any personal benefit or advantage by reason of his position distinct from the coshareholders. By assuming the office, he undertakes to give his best judgment in the interest of the corporation in all matters in which he is acting for it untrammeled by hostile interest in himself or others. If he acts for himself in matters where his interest conflicts with his duty, the law holds the transaction constructively fraudulent and voidable at the election of the corporation. He is disqualified by the intervention of a personal interest to act in the performance of his duties as trustee for the company, and is not permitted to obtain title to property where he has any duty to perform which is inconsistent with the character of a purchaser on his own account. When a director attempts in viola-

tion of his duty to acquire interests adverse to the corporation in respect to any matter involved in the confidence which has been reposed in him, as to which equity imposes a disability upon him to deal in his own behalf, the court will hold him as a trustee for the corporation, and he must account for the profits which otherwise would have accrued to the corporation. The product of the transaction will belong to the corporation exclusively. The law will presume that whatever was done in furtherance of the original scheme, under which the agency was created, was done under and through the agency. The burden of showing that the relation was changed before or during the agency rests upon the party so affirming.

It is asserted by counsel for the defendants that, when Coleman withdrew his offer, the duty on Pierre's part of acting for the company was at an end and he was then free to act for his individual interests. It must be assumed that Coleman's conclusion to withdraw the offer, qualified, as it was, by a suggestion of renewing it in the future, was affected by Pierre's breach of the fidelity he owed to the company in misinforming and misleading Coleman as to the real action of the finance committee. And it is shown that Pierre, while the duty rested upon him of negotiating solely in the company's interests, initiated by suggestion to Coleman the plan for a financing of the transaction otherwise than by a sale to the company. The finance committee was in favor of purchasing the stock, but that fact and the reasons for not buying it at $160 had not been stated to Coleman, although it was rapidly rising in value and Coleman, knowing this, was kept by Pierre in ignorance of facts which Pierre should have disclosed to him. He, in whom confidence was reposed of faithfully representing the company in the transaction, cannot, after betraying his trust through suppression of the facts and through abandonment of his principal by suggestion of a sale through an outside financing, now take advantage of his own wrong and successfully claim that the resulting withdrawal of the offer, thus brought about and concealed from his principal until the trial of the cause, relieves him of any further responsibility and put him in a position to thereafter deal for himself.

There never has been, however, any corporate action determining whether or not the company should purchase the stock. If such action had been taken, the remedy afforded to the plaintiffs would properly be a decree declaring it to be the duty of the defendants to assign and transfer the stock to the E. I. du Pont de Nemours & Co. upon reimbursement of the cost of acquiring it and an accounting for dividends received thereon, or in case it should be found that the stock could not for any reason be transferred to the E. I. du Pont de Nemours & Co., an accounting for the difference between the cost and the fair market value of the stock, together with the dividends received thereon. The question whether the company should or should not acquire the stock, or any part thereof, not having been determined by the company, that question of business policy is not one for the determination of the court. The court cannot place itself in the position of the corporation and determine that the company should take advantage of the opportunity to purchase the stock as it has a right

to do, but it is still a question which is open to the company for its decision, notwithstanding that it is a foregone conclusion that its acquisition would be of enormous profit to the company. This question must therefore be determined by the company itself. If it were referred to the board of directors, that board is disabled for the purpose of passing upon the question, as the majority of the directors are disqualified by interest to act upon the matter. The board, therefore, could not summon a qualified quorum. The only course remaining, therefore, is to put the question before the stockholders of the E. I. du Pont de Nemours & Co. for their decision at a meeting called for that purpose, to be conducted under the supervision of a special master after due notice thereof and notice of the decree in this cause, the holders of the stock acquired from T. Coleman du Pont or the proceeds in stock of E. I. du Pont de Nemours & Co. thereof to be enjoined from voting said stock.

Counsel for the respective parties have submitted requests for findings of fact and conclusions of law, which have been filed in the cause, and which, together with the answers thereto, are hereby made a part of this opinion with the same force and effect as though set out herein in full.

The answers to the plaintiffs' requests for findings of fact declined or qualified, without repeating the requests, are as follows:

30. Answer: This request is declined for the reason that, while Coleman was willing to sell to the company, he was also willing to have the purchase made for the benefit of the men who were working for the company, under some other method of financing.

35. Answer: I so find provided the request means no other offer was made by Coleman after the offer considered at the finance committee meeting of December 23, 1914.

41. Answer: This request is declined. It is found, however, that the ownership of the stock was an essential and potent factor in the practical control of the Powder Company.

45. Answer: This finding is declined for the reason that, while it is improbable that the loan would have been so made, the negative form of the request is too broad a conclusion to draw from the evidence.

As to all of the requests of the plaintiffs for findings of fact, with the exception of those above specifically answered, I find as requested, and such findings are made the findings of the court and a part of this opinion.

The answers to defendants' requests for findings of fact declined or qualified, without repeating the requests, are as follows:

3. Answer: The request is broader than is justified by the evidence. I find, however, that that is the only manufacturing and mercantile business in which the corporation is engaged.

14. Answer: I so find as to the actual business and prospective business in the manufacture and sale of powder and concerning the finances of the company, provided that the term "business" does not include the business in relation to Coleman's offer to sell his stock.

15. Answer: This request is declined because the evidence does not show whether or not Pierre S. du Pont, by reason of his position as

acting president and his being in closer touch with all the principal officers of the company and its manufacturing and commercial business, had opportunities to become informed and did have information which Alfred I. du Pont did not have.

18. Answer: This request is declined.

19. Answer: As to the first part of the request down to and including the words "by T. Coleman du Pont," it is so found. The remainder of the request is declined.

22. Answer: This request is declined for the reason hereinbefore stated at length.

24. Answer: As to the portion of this request down to and including the words "160 per share," it is so found. As to the concluding part, "and never instructed or intimated to Pierre S. du Pont that they would increase the price beyond $125 a share," it is declined, as it has been hereinbefore found that Alfred I. du Pont did make an intimation to Pierre S. du Pont that if the offer were held open the committee might increase its offer.

25. Answer: As to this request, I so find as to the part thereof down to and including the words "with Mr. T. C. du Pont further." The part thereafter, which excludes any other meaning than that therein set out, is declined. The concluding clause, "and the action of the finance committee as expressed in the resolution at the price fixed in the resolution was 'approved, ratified and confirmed' by the board of directors at that meeting," is declined because it carries the inference that the resolution as set out in the minutes was presented to the board. What was approved, ratified, and confirmed was what was set forth in the report.

27. Answer: This request is declined. There is no evidence that Pierre mentioned the price of $125 to Dunham, or that he did anything further than tell Dunham that the finance committee had refused to accept the offer.

29. Answer: This request is declined. While the correspondence standing alone may show such desire on the part of Pierre, the existence of such a desire is inconsistent with his conduct.

31. Answer: The latter part of the request, as follows, "the letter contains no suggestion of a sale to the company," is declined. As to the portion of the request down to the words "through outside agencies," it is so found.

35. Answer: This request is declined. Coleman's letter of February 13, 1915, did contain a suggestion of a renewal of a proposition to sell the stock to the company.

39. Answer: This request is declined.

40. Answer: This request is declined. Provided that if the words "a few" are struck out, it is so found.

41. Answer: This request is declined.

43. Answer: I decline to so find because at the meeting held on March 15, 1915, the plaintiffs and all of the stockholders, with the exception of those interested in the acquisition of Coleman's stock, were fraudulently kept in ignorance of Pierre's breach of trust and that of his associates, and therefore the action of the stockholders'

meeting was obtained by fraud and concealment, which renders it null and void.

44. Answer: This request is declined for reasons hereinbefore stated.

45. Answer: This request is declined.

46. Answer: This request is declined.

47. Answer: This request is declined.

48. Answer: This request is declined.

49. Answer: This request is declined. It is shown by the evidence, including Dunham's telegram to Coleman of February 17, 1915, that the first suggestion for the sale of the whole of Coleman's stock came from Pierre.

50. Answer: This request is declined. There is no evidence that Coleman knew that fact until Pierre closed the bargain.

53. Answer: This negative request is declined. The ownership of the said stock was an essential and potent factor in the practical control of the Powder Company.

54. Answer: This request is declined as irrelevant and immaterial and also because there is no evidence to either support or contradict it.

58. Answer: It is so found. J. P. Morgan & Co. also relied upon the official connection of Pierre and his associates with the Powder Company.

59. Answer: This point is declined because it involves a conclusion not supported by the evidence as to what was the usual and ordinary course of J. P. Morgan & Co.'s business. It is found that J. P. Morgan & Co. did rely upon the value of the stock and the personal guaranties in addition to the other circumstances inducing them to make loans as hereinbefore found in this opinion.

61. Answer: This request is declined. The facts in evidence show that there was an understanding on the part of Pierre and Raskob that the depositary banks were to participate in the loan.

63. Answer: This request is declined.

65. Answer: It is so found provided the company had purchased upon the terms dictated by Pierre and his associates, and the term "their interest" refers to the number of shares they were to receive under either arrangement. They had at that time a personal interest in carrying out what would be to Pierre's interest in preference to the interests of the stockholders.

66. Answer: This request is declined. The evidence shows that Mr. Laffey could have had no information upon which to volunteer such statement, unless he had been asked the question by Pierre.

74. Answer: It is so found with the qualification that the voting in favor of the resolution, of the shares for which the proxies were obtained through the circular letter hereinbefore referred to, was a fraud upon those stockholders and the company, and the result so obtained is null and void.

75. Answer: The latter part of this request is declined from the words "but the statements" to the end of the request. The words "Total Working Capital" used upon the forms were used in the commercial sense to indicate the quick or fluid assets and those quick or

fluid assets were considered as its "working capital" by the company. As to the first part of the request, it is found as stated therein.

78. Answer: This request is declined.

79. Answer: This request is declined.

81. Answer: This request is declined, except as to the statement in the first paragraph that Pierre purchased the stock of T. Coleman du Pont for himself and his associates.

82. Answer: This request is declined for the reasons hereinbefore stated in the discussion of the effect of the vote of approval.

As to all of the requests of the defendants for findings of fact, with the exception of those above specifically answered, I find as requested, and such findings are made the findings of the court and a part of this opinion.

The plaintiffs' requests for conclusions of law are answered as follows:

1. Answer: It is so found.

2. Answer: It is so found.

3. Answer: It is so found.

4. Answer: It is so found.

5. Answer: It is so found, subject to what has been stated as the conclusion of the court upon the submission of the question of acquiring the stock to a meeting of the stockholders of the E. I. du Pont de Nemours & Co., and provided the stockholders decide that the company shall avail itself of its right to acquire the stock.

The defendants' requests for conclusions of law are answered as follows:

1. Answer: This request is declined.

2. Answer: This request is declined.

3. Answer: This request is declined.

4. Answer: This request is declined.

5. Answer: This request is declined. The latter part of the request is a mixed conclusion of fact and law and too broad to be justified by the evidence.

6. Answer: It is so found.

7. Answer: This resquest is declined as applied to the Powder Company if the word "speculate" is used in the sense of purchasing its stock for investment, for retirement, or for resale.

8. Answer: This request is declined as having no relation to the facts in this case.

9. Answer: This request is declined, in view of the sense in which the defendants have used the word "surplus."

10. Answer: It is so found.

11. Answer: The general proposition of law is correct, but it has no bearing upon the facts in this case and is therefore declined. The action of the board was obtained under circumstances which made it a fraud upon the company and the stockholders. The fact that there were existing conditions which would justify the exercise of a fair discretion becomes immaterial.

12. Answer: It is so found.

13. Answer: It is so found.

14. Answer: This request is declined.

15. Answer: This request is declined.
16. Answer: This request is declined.
17. Answer: This request is declined.
18. Answer: This request is declined.
19. Answer: It is so found provided that conversations in which Alfred or William made statements to Pierre in relation to Coleman's offer to sell his stock were notice to Pierre of the attitude of the other members of the finance committee and their construction of the instructions given him and have a bearing upon the question of his good faith in carrying out those instructions.
20. Answer: It is so found.
21. Answer: This request is declined.

A decree will be entered in favor of the plaintiffs in accordance with this opinion.